IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
            PLAINTIFF,           )
                                 )
        v.                       )   CIVIL ACTION NO. 2:06cv736-WKW
                                 )
SEVENTY FOUR THOUSAND SEVEN      )
HUNDRED ($74,700) DOLLARS IN     )
UNITED STATES CURRENCY,          )
                                 )
            DEFENDANT.           )

UNITED STATES OF AMERICA'S TRIAL BRIEF

The United States of America (United States), by and through
Leura G. Canary, United States Attorney for the Middle District of
Alabama, and John T. Harmon, Assistant United States Attorney,
hereby submits the following:

I.   BACKGROUND.

The parties agreed to submit this matter for decision on
briefs, reports and the transcript of the suppression hearing
conducted on September 6, 2007.   To that end, this is the
submission of the United States.[1]

II.   BURDEN OF PROOF.

The government's burden of proof in forfeiture cases is the
same as all civil cases: preponderance of the evidence.   See 18
U.S.C. § 983(c)(1). The United States need not show a substantial
connection in drug proceeds cases such as this one.   See 18 U.S.C.

---

[1]Pursuant to the parties agreement, the United States is concurrently filing the relevant
Certificate of Analysis to show the forensic analysis results on the drug items seized at the
residence.

§ 983(c)(3).  <u>See</u> <u>also</u> <u>United States v. $21,000 in U.S. Postal</u> <u>Money Orders</u>, 295 F.Supp. 597, 601-02 (E.D. Mich. 2003).[2]

Under CAFRA, with respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, an "innocent owner" is an owner who did not know of the illegal conduct giving rise to forfeiture or an owner who, upon learning of this illegal conduct did all that could reasonable be expected under the circumstances to terminate such illegal use. <u>See</u> 18 U.S.C. § 983(d)(2)(A)(i) and (ii).

In this case, the burden of proof is upon the United States by a preponderance of the evidence to show that the property at issue is subject to forfeiture.  <u>See</u> 18 U.S.C. § 983(c).  However, the claimant has the burden of establishing the innocent owner defense should such a defense be asserted.  <u>See</u> 18 U.S.C. § 983(d).

III.  <u>CITATION OF AUTHORITY</u>.

A.  <u>Forfeiture of Defendant Cash</u>.

That currency is substantially connected with an illegal drug exchange may be established by either direct or circumstantial evidence.  Even without direct evidence, however, cash has consistently been found forfeitable as exchange money or proceeds when it is discovered in large amounts along with other indicia of related illegal activity, such as drugs.  <u>United States v.</u>

_____

[2]The burden shifted to the government upon passage of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA).

$93,685.61 in United States Currency, 730 F.2d 571, 572 (9th Cir. 1984) cert. denied sub nom., Willis v. United States, 469 U.S. 831 (1984). Circumstantial evidence of drug transactions is sufficient to support the establishment of probable cause in a forfeiture proceeding. Id., citing United States v. $364,960.00 in United States Currency, 661 F.2d 319, 324-325 (5th Cir. 1981). The United States need not trace the money or property to specific transactions. United States v. $41,305.00 in United States Currency, 802 F.2d 1339, 1343 (11th Cir. 1986); United States v. Four Million, Two Hundred Fifty-Five Thousand, 762 F.2d 895 (11th Cir. 1985); United States v. $242,484.00, 389 F.3d 1149, 1160 (11th Cir. 2004)(en banc); see also United States v. One 1987 Mercedes 560 SE, 919 F.2d 327, 331 (5th Cir. 1990).

To establish a case, the United States must only show that the Defendant currency was probably derived from illegal drug transactions. The United States may make such a showing by introducing evidence of narcotics trafficking and income derived therefrom. All that is required is that a court be able to look at the aggregate of the facts and find reasonable ground that the property probably was derived from drug transactions. See United States v. Parcels of Land, 903 F.2d 36 (1st Cir. 1990), cert.

<u>denied</u>, 111 S.Ct. 289 (1990).  <u>See also</u> <u>$41,305.00</u>, 802 F.2d at 1343; <u>Four Million, Two Hundred Fifty-Five Thousand</u>, 762 F.2d at 904.[3]

    B.   <u>Innocent Owner</u>.

The claimant, should he assert this defense, has the burden to establish this defense by a preponderance.  <u>See</u> Part I. above.

A claimant attempting to establish an innocent owner defense must establish his financial transactions.  <u>United States v. $41,305</u>, 802 F.2d 1339, 1345 (11th Cir. 1986).

The person who committed the offense cannot be an innocent owner.  <u>United States v. Six Negotiable Checks</u>, 207 F.Supp.2d 677 (E.D.Mich. 2002).

IV.  <u>CITATION TO THE RECORD</u>.

    A.   George Jones resides at 5304 West Shades Valley Drive in Montgomery, Alabama (the "residence").  <u>See</u> Motion to Suppress filed by George E. Jones.

---

[3]Many of these cases are discussing the establishment of the original "probable cause" standard.  Of course, the higher "preponderance" standard applies to the United States' burden in this case.  However, these cases still establish the requirements to meet the United States' burden even at the higher level.  <u>See</u> <u>U.S. v. $22,991.00, More or Less, in U.S. Currency</u>, 227 F.Supp. 2nd 1220, 1230  (S.D.Ala. 2002).  The government is required to prove the same connection between the defendant property and the offense that it was required to prove prior to the passage of CAFRA.

B.  Upon police officers' approach to the residence, they observed George Jones and Otis Jones in the yard. Upon the officers' approach George Jones fled. (Transcript-pages 8, 41, 56).

C.  George Jones was pursued by police officers. He fled into the backyard of the residence, jumped the fence and ran to the next street. (Transcript-pages 8, 41, 43, 56).

D.  While he was running, George Jones was attempting to take an object out of his pants pocket. He eventually got the object out of his pocket and threw it aside as he was being taken into custody. The bag was recovered close to where George Jones was taken into custody. (Transcript-pages 44, 45, 56, 57).

E.  The object George Jones threw down was a plastic package containing a white powder which appeared to be cocaine. (Transcript-pages 45, 57, 58).

F.  After being taken into custody, George Jones was taken back to the residence. (Transcript-page 58).

G.  Another officer took Otis Jones into custody. This officer searched Otis Jones' truck and recovered a firearm and a quantity of powder cocaine. The truck was in the yard at the residence. (Transcript-pages 8, 10, 11).

H.   During the search of the residence, wrappers and black tape was found underneath the bed in George Jones' room. These items and the area smelled of raw cocaine and there was powder residue on the wrappings. (Transcript-page 46).

I.   The Defendant currency was found under a bed in the residence. (Transcript-page 70).

J.   During the search of the residence, a ziplock plastic bag containing powder cocaine, partially compressed was found underneath the bathroom sink in a cabinet. (Transcript-page 76).

K.   Officers received information respectively in 2005 and 2006 that illegal drug activity was occurring at the residence and that there was a large amount of currency at the residence. (Transcript-page 15).

L.   Forensic tests upon the seized substances determined the substances to be cocaine. <u>See</u> Exhibit 8, attached herewith and submitted without objection per the parties stipulation.

V.   <u>ARGUMENT</u>.

There is strong evidence that George Jones was involved in substantial drug crimes at the residence. He had cocaine on his person, an individual visiting the residence had cocaine and a weapon in his vehicle; drug wrappings with residue were found in

6

the residence, a quantity of cocaine was found in the residence, and a large amount of cash was found in the residence.

George Jones has introduced no evidence to overcome the strong showing by the United States or to establish any defense to forfeiture. Accordingly, the United States has shown, by a preponderance of the evidence, that the Defendant currency is subject to forfeiture. Likewise, George Jones has failed to establish any defense, as is his burden.

The currency should be forfeited to the United States.

Respectfully submitted this 29th day of October, 2007.

FOR THE UNITED STATES ATTORNEY
LEURA G. CANARY

/s/John T. Harmon
John T. Harmon
Assistant United States Attorney
Office of the United States Attorney
Middle District of Alabama
131 Clayton Street
Post Office Box 197
Montgomery, Alabama 36101-0197
Telephone:(334) 223-7280
Facsimile:(334) 223-7560
E-mail: John.Harmon@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Bruce Maddox**.


/s/John T. Harmon
John T. Harmon
Assistant United States Attorney





**ALABAMA**
## DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210518 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2838 | (334) 242-3093 |

### CERTIFICATE OF ANALYSIS

Detective S. T. Wright
Montgomery Police Department
P. O. Drawer 159
Montgomery, AL 36101-0159

**CASE NUMBER:**    06MG01694        **SUBMITTING AGENCY CASE NUMBER:**

| | | Race | Sex | Date of Birth | Status |
|---|---|---|---|---|---|
| SUSPECT(S): | GEORGE JONES | B | M | 09/22/1977 | Adult |

**SERVICE REQUESTED:**  Drug Analysis

**CHAIN OF CUSTODY:**

| | DATE | TIME |
|---|---|---|
| Detective S. T. Wright *from* Montgomery Police Department | 04/04/2006 | 14:30 |
| Michael L. Hitchcock | 04/04/2006 | 14:33 |
| Brandinika Ritter | 04/14/2006 | 13:49 |

**DESCRIPTION OF EVIDENCE:**

1.         One manila envelope containing

1A.       One manila envelope containing

1A1.      One plastic bag containing

1A1a.     One plastic bag containing powder material

1A1b.     One plastic bag containing powder material

1A2.      One plastic bag containing powder material

1B.       Two manila envelopes each containing drug evidence

**RESULTS OF ANALYSES:**                **DATE(S) OF ANALYSES:**    04/18/2006

1A1a.    No analyses were performed.
1A1b.    Laboratory analyses of the powder material revealed the presence of cocaine hydrochloride [a C-II controlled substance]. Weight in grams - 71.86  No analyses were performed on the plant material.
1A2.     No analyses were performed.



*An ASCLD/LAB Accredited Laboratory since October 2003*

GOVERNMENT'S
EXHIBIT
8

Page 1 of 2

Continuation of case 06MG01694

1B.     No analyses were performed.

Sworn to and subscribed to me this the 28 Day of APr 20 06 as true and correct


Brandinika Ritter
_____
Brandinika Ritter
Forensic Scientist
Analyst

||||||| ||||| ||| ||| ||||| ||| ||||| |||| ||| ||

_____
Notary Public



1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4

 5  UNITED STATES OF AMERICA,

 6       Plaintiff,

 7  VS.                         CASE NO.:  2:06cv736-WKW

 8  $74,700 IN UNITED STATES CURRENCY,

 9       Defendant.

10                 * * * * * * * * * * *

11                      MOTION HEARING

12                 * * * * * * * * * * *

13         BEFORE THE HONORABLE W. KEITH WATKINS,

14  UNITED STATES DISTRICT JUDGE, at Montgomery, Alabama, on

15  September 6, 2007, commencing at 1:50 p.m.

16                      APPEARANCES:

17  FOR THE PLAINTIFF:  Mr. John T. Harmon
                        Assistant United States Attorney
18                      OFFICE OF THE UNITED STATES ATTORNEY
                        131 Clayton Street
19                      Montgomery, Alabama

20  FOR THE DEFENDANT:  Mr. Bruce Maddox
                        Attorney at Law
21                      6728 Taylor Court
                        Montgomery, Alabama
22

23         Proceedings reported stenographically;

24            transcript produced by computer.

25
```

GOVERNMENT'S
EXHIBIT
9

PATRICIA STARKIE, RDR, CRR, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, MIDDLE DISTRICT OF ALABAMA
ONE CHURCH STREET, MONTGOMERY, AL. 36104   334-262-1221

1                    EXAMINATION INDEX

2                  VANESSA DAVIS WRIGHT

3    DIRECT BY MR. HARMON . . . . . . . . . .      5

4    CROSS BY MR. MADDOX . . . . . . . . . . .     11

5    REDIRECT BY MR. HARMON . . . . . . . . .     29

6    REDIRECT BY MR. HARMON . . . . . . . . .     36

7    RECROSS BY MR. MADDOX . . . . . . . . . .    36

8    REDIRECT BY MR. HARMON . . . . . . . . .     38

9                    PATRICK CROCKETT

10   DIRECT BY MR. HARMON . . . . . . . . . .     39

11   CROSS BY MR. MADDOX . . . . . . . . . . .    47

12                     SHON WRIGHT

13   DIRECT BY MR. HARMON . . . . . . . . . .     53

14   CROSS BY MR. MADDOX . . . . . . . . . . .    59

15   REDIRECT BY MR. HARMON . . . . . . . . .     64

16   RECROSS BY MR. MADDOX . . . . . . . . . .    64

17                     TODD WHEELER

18   DIRECT BY MR. HARMON . . . . . . . . . .     68

19   CROSS BY MR. MADDOX . . . . . . . . . . .    72

20                   KRISTEN BENTLEY

21   DIRECT BY MR. HARMON . . . . . . . . . . .   75

22   CROSS BY MR. MADDOX . . . . . . . . . . .    77

23                    SCOTT EDWARDS

24   DIRECT BY MR. HARMON . . . . . . . . . .     83

25   CROSS BY MR. MADDOX . . . . . . . . . . .    85

3

```
 1   (The following proceedings were heard before the Honorable

 2   W. Keith Watkins, United States District Judge, at Montgomery,

 3   Alabama, on September 6, 2007, commencing at 2:00 p.m.:)

 4        (Call to order of the Court)

 5             THE COURT:  Good afternoon.  Let's take appearances,

 6   please, sir.

 7             MR. HARMON:  John Harmon, Your Honor, for the United

 8   States.

 9             THE COURT:  Good afternoon.

10             MR. MADDOX:  Bruce Maddox, Your Honor, for the

11   claimant.

12             THE COURT:  Good afternoon.  And introduce me to your

13   client, please, sir.

14             MR. MADDOX:  Your Honor, this is George Jones.

15             THE COURT:  Good afternoon, Mr. Jones.

16             THE WITNESS:  How you doing.

17             THE COURT:  All right.  Okay.  We're here for a couple

18   of matters.  I think we'll probably take the pretrial matters

19   last; see how much of the case gets tried today.

20             Before we begin with your first witness, are there any

21   motions that I need to take up or any procedural things?

22             MR. MADDOX:  Judge, the only procedural thing I would

23   offer the Court is a lapse in process of my office.  We had

24   booked on our calendar this hearing for Monday, and I didn't

25   realize it had been moved up, and I made an error not getting my
```

4

```
 1   contentions to the government in time for the pretrial.

 2            THE COURT:  I'll give you until Monday to get them.

 3            MR. MADDOX:  Thank you.  Well, they're very brief; two

 4   sentences.

 5            THE COURT:  All right.  I'm going to invoke the rule.

 6   Anyone that's going to testify other than the plaintiff, of

 7   course, or the government's representative would need to leave

 8   the courtroom, if you-all would take care of that.

 9            MR. HARMON:  Yes, Your Honor.  The United States would

10   ask that we have a government representative -- that would be

11   Detective Scott Edwards -- sit as the government's

12   representative.  If Your Honor will excuse me for a second, I'll

13   go get Detective Edwards.

14            THE COURT:  Are you ready for the first witness?

15            MR. MADDOX:  Yes, sir.

16            MR. HARMON:  Yes, sir.

17            THE COURT:  Okay.  Let's go ahead and start.

18        VANESSA DAVIS WRIGHT, the witness, having been duly sworn,

19   testified as follows:

20            THE COURT:  Good afternoon.  If you would, sit close up

21   to that mike so we can all hear you.  And would you introduce

22   who's at the table?

23            MR. HARMON:  Yes, sir.  This is Detective Scott

24   Edwards, Your Honor.

25            THE COURT:  Hi, Detective Edwards.
```

5

```
 1              MR. EDWARDS:   How you doing, Your Honor.

 2              THE COURT:   Go ahead.   You may proceed.

 3                          DIRECT EXAMINATION

 4  BY MR. HARMON:

 5  Q.   Would you state your name, please, ma'am, and spell your

 6  first and last name.

 7  A.   Vanessa Davis Wright.   The spelling of my first name is

 8  V-A-N-E-S-S-A.   The last name is spelled W-R-I-G-H-T.

 9  Q.   And where do you work?

10  A.   With the Montgomery Police Department.

11  Q.   And what is your title there?

12  A.   Sergeant.

13  Q.   How long have you been so employed?

14  A.   Fourteen years.

15  Q.   Sergeant Wright, I'm going to direct your attention to March

16  31st of last year -- that would be 2006 -- and ask if you were

17  surveilling a property, a piece of real estate, I should say, in

18  Montgomery, Alabama.

19  A.   Yes.

20  Q.   And what street was that on?

21  A.   It was on West Shades Valley.

22  Q.   I'm sorry?

23  A.   West Shades Valley.

24  Q.   Yes, ma'am.   And for what purpose were you surveilling that

25  property?
```

PATRICIA STARKIE, RDR, CRR, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, MIDDLE DISTRICT OF ALABAMA
ONE CHURCH STREET, MONTGOMERY, AL 36104   334-262-1221

6

1    A.    For the purpose of a continuing investigation.    We were

2    attempting to get a full report, a document search warrant for

3    that residence, so we were watching activity going in and out of

4    the house.

5            MR. HARMON:    Your Honor, if I might at this time, I

6    have two exhibits.    I think it's -- well, one exhibit is Exhibit

7    Number 6.    This is a copy of the document search warrant, and I

8    would ask it be admitted into evidence at this time.

9            MR. MADDOX:    Is it the search warrant and the

10   affidavit?

11           MR. HARMON:    It's the search warrant, Your Honor, with

12   the affidavit.    Yes.

13           MR. MADDOX:    No objection, Your Honor.

14           THE COURT:    All right.    It will be admitted over no

15   objection.

16   Q.    During the course of your surveillance of that Shades Valley

17   property, did you see anything occurring there?

18   A.    Yes.    I initially observed a female leave the residence.

19   Once she left the residence, I alerted the officers who were

20   assisting with the surveillance so we could do a traffic stop on

21   that vehicle and identify who the female was.    I also observed a

22   pickup truck.    A male subject drove into the driveway of the

23   residence and got out and went inside the residence.

24   Q.    Did you have any -- Let me ask you this:    Where were you

25   physically located in relation to the Shades Valley property?

1    A.  I say approximately 50 miles away, across the street.

2    Q.  Miles?

3    A.  I'm sorry.  Yards.

4    Q.  And were you in a vehicle?

5    A.  Yes.

6    Q.  Was it an unmarked vehicle?

7    A.  Yes.

8    Q.  Did you have any -- were there any other police officers or

9    agents assisting you in that vehicle with the surveillance?

10   A.  With the surveillance of the house, no, but they were in the

11   area.

12   Q.  That was my next question.  Were there other agents and

13   officers within the area of the Shades Valley property?

14   A.  Yes.

15   Q.  At some point did you become aware that the document search

16   warrant had been issued by the court?

17   A.  Yes.

18   Q.  And what action did you take at that time?

19   A.  At that time, I alerted all the other officers that the

20   warrant was signed and was approved, and we can go ahead and

21   approach the house and make contact with the occupants inside.

22   Q.  And what did you do next?

23   A.  I pulled up to the front of the house along with Lieutenant

24   Crockett and Sergeant Wright.  They pulled up around the same

25   time that I did.

8

1      THE COURT:  Who was the other besides Lieutenant

2  Crockett?

3      THE WITNESS:  Corporal Wright.

4  Q.  Go ahead.  And make sure that everyone understands.

5  Mr. Crockett and Mr. Wright were in another vehicle, not in your

6  vehicle?

7  A.  That's correct.

8  Q.  Okay.  And what happened -- what did you do next?

9  A.  As I was approaching the residence, Jones and -- George

10  Jones and Otis Jones were in the front yard.  As we were

11  approaching the residence, I went towards the pickup truck.  I

12  was on the driver's side of the pickup truck.  At that time,

13  Jones started running, and Lieutenant Crockett and Corporal

14  Wright gave chase.  Then I made contact with Otis Jones and just

15  went on ahead and took him into custody for my safety.

16      THE COURT:  You said Jones began to run.  Was it George

17  Jones who began to run?

18      THE WITNESS:  Yes.

19  Q.  And the George Jones that you saw running, do you see him in

20  the courtroom today?

21  A.  Yes.

22  Q.  Would you indicate to the Court where Mr. Jones is seated.

23  A.  That gentleman right there (indicating).

24      MR. HARMON:  And would the record reflect that the

25  witness has identified the claimant, George Jones, at counsel

1  table.

2    Did you see the -- you said at that point, you initiated

3  contact with an occupant of the Shades Valley residence?

4  A.  Yes, the two individuals that were in the yard.  And once

5  other officers approached the residence, then I went to the side

6  door and made sure -- or attempted to make sure that nobody else

7  was in the house.  I announced my presence, and at that time a

8  female voice was heard, and I instructed her to come up to the

9  front of the house.

10  Q.  Did you later identify who this female voice -- who the

11  person was that was speaking to you?

12  A.  Yes.

13  Q.  And who was that?

14  A.  Jacqueline Jones.

15  Q.  And do you know if there's any relationship between

16  Ms. Jones and George Jones?

17  A.  That's his mother.

18  Q.  And what happened after your initial contact with

19  Mrs. Jones?

20  A.  Once we got her secured, the other officers that arrived on

21  the scene did a search of the residence for any additional

22  subjects inside the house.  And it was at that time a large

23  quantity of currency was located up under the third bedroom --

24  up under the bed of the third bedroom.

25  Q.  At some point, were other items besides the currency

1  observed during the course of the execution of the document

2  search warrant?

3  A.  When Corporal Wright gave chase of George Jones, he did

4  discard a quantity of powder cocaine from his pocket.  As he was

5  running, he tossed it.  But inside the house, I can't recall

6  anything being observed when we entered.

7  Q.  Was a second and subsequent search warrant obtained to your

8  knowledge?

9  A.  Yes.

10      MR. HARMON:  Your Honor, at this time, United States

11  would ask that the Court enter the evidence, document number

12  6 -- excuse me -- document number 7, which is a copy of what's

13  been noted as the drug search warrant.

14      THE COURT:  Any objection?

15      MR. MADDOX:  No objection, Your Honor.

16      THE COURT:  It's admitted over no objection.

17      MR. HARMON:  Thank you, Your Honor.

18  Q.  And what areas --

19      Let me back up and ask you this.  What areas did you search

20  during the course of execution of these two warrants?

21  A.  I ended up going back outside in the front yard, and I began

22  a search of the pickup truck.

23  Q.  And do you know whose truck that was?

24  A.  Otis Jones.

25  Q.  And did you recover anything from Otis Jones' truck?

11

1   A.   I recovered a 9 millimeter Glock and a quantity of powder

2   cocaine.

3   Q.   Now, after you had found these two items in Otis Jones'

4   truck, did you have occasion to talk to Mrs. Jones again?

5   A.   Yes.

6   Q.   And what did she tell you at that time?

7   A.   At that time, she wasn't aware of the large amount of

8   currency that we found inside the house.  She stated that she

9   was not aware that it was there; and if she was aware that it

10   was there, she would have gotten some repairs done to her

11   house.  She began pointing out some things that needed repairs

12   inside of her house.

13   Q.   Thank you, ma'am.  Will you answer Mr. Maddox's questions,

14   please.

15            THE COURT:  Mr. Maddox?

16            MR. MADDOX:  Thank you, Your Honor.

17                   CROSS EXAMINATION

18   BY MR. MADDOX:

19   Q.   It's Sergeant Wright?

20   A.   Yes.

21   Q.   Sergeant Wright, good afternoon.

22       You were in charge of the operation at that home on West

23   Shades Valley, weren't you?

24   A.   Yes.

25   Q.   Okay.  And you had doing surveillance with you how many

12

```
 1  other officers in addition to yourself?

 2  A.  You want the approximate number?

 3  Q.  Well, I'd like the exact number, if I could get it.

 4  A.  It's going to be approximate, because I can't recall how

 5  many SWAT members were out there with us.  I know it was myself,

 6  Lieutenant Crockett, Corporal Bentley, Corporal Wright, and

 7  approximately four SWAT members, five SWAT members, so I would

 8  say nine of us out there initially.

 9  Q.  All right.  Now, one of those -- I'm going to skip ahead on

10  a couple of things here and ask you this.  One of those officers

11  at least was wearing a mask, wasn't he?

12  A.  Yes.

13  Q.  Who was that?

14  A.  Corporal Wright.

15  Q.  Corporal Wright.  And you said he approached Mr. Jones?

16  A.  Both Crockett -- Lieutenant Crockett and Corporal Wright

17  approached Jones.

18  Q.  Okay.  And were they running or walking as they approached

19  him?

20  A.  They were walking.

21  Q.  They were walking?

22  A.  Yes.

23  Q.  Did they have guns out?

24  A.  Not that I can recall.

25  Q.  Did your SWAT team members have guns?
```

13

```
 1   A.   No.

 2        Did they have guns on them?

 3   Q.   Yes, ma'am.

 4   A.   Yes.

 5   Q.   What kind?

 6   A.   I'm not sure what kind they had.

 7   Q.   How were they dressed?

 8   A.   They weren't out there when we initially pulled up.

 9   Q.   I'm sorry?

10   A.   They were not out there on the scene when we initially

11   pulled up.

12   Q.   Oh, okay.   They were just in reserve, so to speak?

13   A.   Yes.

14   Q.   All right.   How was Mr. Crockett dressed?

15   A.   He was dressed in plain clothes with police vest -- with his

16   police vest on.

17   Q.   Was he wearing a mask also?

18   A.   No.

19   Q.   Why was Mr. Bentley wearing -- I mean -- I'm sorry --

20             THE COURT:   Wright.

21             MR. MADDOX:   Yes.   Wright.

22   Q.   Why was Mr. Wright wearing a mask?

23   A.   All of our undercover officers who have a potential of

24   mingling with individuals who are engaged in drug activity, we

25   try to conceal their identity as much as possible, so that's why
```

```
 1   he was wearing a mask.

 2   Q.  Okay.  Now, at the time you first arrived there, you didn't

 3   have a search warrant, did you?

 4   A.  We had it.

 5   Q.  When you first arrived there?

 6   A.  When we conducted surveillance?

 7   Q.  Yes, ma'am.

 8   A.  No.  We didn't have the search warrant secured at that time.

 9   Q.  And the car that left with the female in it, you said a

10   traffic stop was conducted.  Does that mean she violated a

11   traffic law?

12   A.  I should say an investigative stop was conducted.

13   Q.  An investigative stop.  And was her vehicle searched?

14   A.  Not that I'm aware of.  It probably -- it could have been

15   searched, and that would have been the determination of the

16   individual officers that were out on the scene.

17   Q.  And who stopped that vehicle?

18   A.  It's going to be one of the SWAT members stopped the

19   vehicle.

20   Q.  One of the SWAT members stopped it?

21   A.  Yes.

22   Q.  Were they in marked vehicles?

23   A.  I can't recall.

24   Q.  Were they in normal police uniform?

25   A.  No.  They would have been in black uniforms with police
```

```
 1   visible.
 2   Q.  You said after that, a pickup truck came to the residence?
 3   A.  Yes.
 4   Q.  Where did it park?
 5   A.  In the driveway.
 6   Q.  And you said someone got out of that truck?
 7   A.  Yes.
 8   Q.  Who was that?
 9   A.  It was later determined to be Otis Jones, but at that time
10   only thing I could advise was a black male subject got out of
11   the vehicle.
12   Q.  Okay.  Now, you said you were there doing surveillance
13   pursuant to an investigation.  How long had you been
14   investigating this residence or Mr. Jones?
15   A.  We received information concerning drug activity taking
16   place at the residence back in 2005, and then Corporal Bartlett
17   received additional information in 2006 concerning a large
18   quantity of currency being inside the residence.  And --
19   Q.  You don't know what information exactly Mr. Bartlett
20   received, do you?
21   A.  Yes, I do, because it's listed on the document search
22   warrant.
23   Q.  But other than what he said in the affidavit of the search
24   warrant, you don't personally know, do you?
25   A.  If there's any additional information?  No.
```

16

1   Q.   Okay.   Now, did you know anything about Mr. Jones as a

2   result of your participation in this?

3   A.   George Jones?

4   Q.   Yes, ma'am.   I'm sorry.   There was another Mr. Jones.

5   George Jones.

6   A.   I'm not understanding the question.

7   Q.   Okay.   Did you know where George Jones worked, for example?

8   A.   No.

9   Q.   Have you ever heard of George's Dinette?

10  A.   No.

11  Q.   Okay.   When you went there and received word -- after seeing

12  these things, you received word that the warrant had been

13  signed.   You sent officers into the residence and actually went

14  in yourself and approached the fellows in the vehicle, and

15  George Jones ran; is that right?

16  A.   That's correct.

17  Q.   You didn't have a search warrant then, did you?

18  A.   Yes, we did.

19  Q.   You had it with you?

20  A.   Had it in hand, no.

21  Q.   Okay.   Where was the search warrant when you did that?

22  A.   It was in Corporal Bartlett's possession.

23  Q.   Okay.   Do you of your own personal knowledge know for a fact

24  that that search warrant had actually been signed at the time

25  you did that, or did you simply take Bartlett's word for it?

1   A.   I took Bartlett's word that it was signed.

2   Q.   Okay.   Now, when you went to the truck, what happened?   I

3   know you didn't go.   When the two officers approached the truck,

4   what happened?

5   A.   When all three of us approached the residence, we had George

6   Jones running.   After he ran, for my safety I went ahead and

7   took Otis Jones -- I put him into handcuffs for my safety and

8   his.

9   Q.   All right.   So Otis Jones was handcuffed.   Is that when you

10  ordered the search of the truck?

11  A.   No.   After he was handcuffed and additional officers arrived

12  on the scene, our next priority was to secure the residence and

13  locate any other individuals inside the residence who might pose

14  a danger to us.

15  Q.   Okay.   And once you did that, is that when the truck was

16  searched?

17  A.   After everything was secured, we started a search.

18  Q.   Okay.   Was the warrant there then?

19  A.   I can't recall if it came then.

20  Q.   Did the warrant authorize you to search vehicles there?

21       MR. HARMON:   Your Honor, at this point, I want to

22  object on materiality and relevance.   It's clear that the

23  vehicle belongs to Otis Jones.   The current claimant has no

24  standing to question the search of that vehicle or anything that

25  stems from that.

18

1          THE COURT:  Mr. Maddox, why are you going into the

2     vehicle?

3          MR. MADDOX:  Couple of reasons, Judge.  Number one, the

4     vehicle was on his property.  But more importantly, we've

5     alleged that there was insufficient probable cause.  I'm also

6     trying to demonstrate that there was not a facially valid search

7     warrant upon which she relied in taking the actions she took.

8     And a part of that would be overbreadth in the execution of a

9     search warrant if it, in fact, existed at the time.

10          THE COURT:  Well, for purposes of a motion to suppress

11     on the money found under the bed, allegedly in the third

12     bedroom, I'm going to sustain the objection.  I want to stay

13     away from the truck right now.  I'll think about that as far as

14     when we get to the final hearing.  But as far as suppressing

15     this evidence right here, we're just talking about the money.

16     And I know that you have some statements that maybe come in

17     later on by the claimant or someone else, and I would see

18     whether that would be relevant.  I'm going to sustain the

19     objection as to the search of the truck.

20          MR. MADDOX:  May I add one reason to that?

21          THE COURT:  You may.

22          MR. MADDOX:  All right, sir.  In the search of the

23     truck, they found drugs.  Later in the affidavit for the second

24     search warrant on which they relied for some of the information,

25     they -- the affiant says -- it's the second paragraph of the

```
 1  affidavit.  On March 31st, Montgomery PD executed a document

 2  search warrant at the address.  During the execution of the

 3  search warrant, illegal narcotics were found.  I believe I can

 4  show that at the time this was done, the only illegal narcotics

 5  that were found had been found in that truck.

 6          THE COURT:  Now, this was done at 11 -- what was the

 7  time?  11:25.

 8          Mr. Harmon, is it the government's position that drugs

 9  were found in the house?

10          MR. HARMON:  I believe it is, Your Honor.  There were

11  drugs found in the house, which will -- another witness will

12  testify to also.  But there were also drugs found in the

13  vehicle.  The drugs were found -- a separate quantity of drugs

14  was found in the house.

15          THE COURT:  Okay.  I'm still going to sustain the

16  objection.  You've got it in there that she searched the

17  vehicle, and I'll take note that she searched the vehicle.  Now,

18  if you want to tie that into the time line with other things,

19  you can go right ahead.  That would be relevant.

20          MR. MADDOX:  Thank you, Judge.

21  Q.  Sergeant Wright, a second search warrant was obtained, was

22  it?

23  A.  Yes.

24  Q.  At the time the second search warrant was obtained, the only

25  drugs that had been found on that property was in the truck,
```

1  wasn't it?

2  A.  In the truck, and then the drugs that was recovered that

3  Mr. Jones threw.

4  Q.  They were not recovered on the property, were they?

5  A.  But he left the property with it.  He came out of the

6  property -- out of the residence --

7  Q.  Is that a yes or no?  They were recovered on the property or

8  they weren't?

9  A.  It was recovered on the property, yes.

10  Q.  It was?

11  A.  The drugs initially were on the property.  It was in

12  Mr. Jones' possession when he came out of the house.  And I'm

13  referring to George Jones.  When he ran away from the property,

14  he discarded the drugs, and they were recovered after he had

15  discarded them.

16          THE COURT:  Were the drugs recovered on the property or

17  off the property?

18          THE WITNESS:  No, it was off.

19  Q.  Okay.  And from the time you saw him run until sometime

20  later when the drugs were recovered, you don't know what

21  happened personally, do you?

22  A.  Once he ran away?

23  Q.  Yes, ma'am.

24  A.  No.

25  Q.  So at the time the second search warrant was obtained, the

1    only drugs that had been found on the property were from the

2    truck, weren't they?

3    A.   That's correct.

4    Q.   Okay.  Now, you've testified about this in state court,

5    haven't you?

6    A.   Yes.

7    Q.   Okay.  Is it a fair statement to say that you thought it was

8    okay to search the truck because all of your search warrants

9    usually authorized the search of every vehicle and every person

10   on the property?

11   A.   That's correct.

12   Q.   Okay.  So you were relying on your standard search warrant

13   in acting the way you did before you saw it; is that right?

14   A.   That's correct.

15   Q.   Okay.  Did you have at the time of the search any

16   information that drugs had been located on that residence, say,

17   within the past 72 hours?

18   A.   That drugs were seen?

19   Q.   Yes, ma'am.

20   A.   No.

21   Q.   When you went to -- what did you think you were looking for

22   when you went to that residence?

23   A.   Large sums of money.  Large sums of money and any type of

24   paper document relating to drug enterprise.

25   Q.   And where did you believe you were authorized to search?

```
 1   A.  Everywhere, even inside and outside; out buildings, any
 2   vehicles, any persons, anywhere inside the house.
 3   Q.  Okay.  And how were you going to identify the documents you
 4   were looking for?
 5   A.  That would have been a determination made by Corporal
 6   Bartlett.  We would collect all documents and then let him
 7   review them and see if they were any evidentiary value.
 8   Q.  If you saw -- Well, let me put it a different way.  You
 9   wouldn't necessarily, yourself, know what documents were and
10   weren't to be seized, would you?
11   A.  I would know some general documents such as bank books, bank
12   statements, anything that's going to show his work history,
13   things like that.
14   Q.  Okay.
15   A.  We would collect those.  Any photographs depicting drug
16   activity where they might be showing large sums of money or
17   weapons or showing drugs.
18   Q.  And when you say bank books, for example, you would have
19   seized every bank book you found?
20   A.  Under his name.
21   Q.  Under his name?
22   A.  Yes.
23   Q.  Did you, in fact, search bedrooms of other people who lived
24   there?
25   A.  Yes.
```

1    Q.  Did you find, for example, his mother's diary?

2    A.  I can't recall if we found that.

3    Q.  Okay.  Did your search warrant authorize you to search for

4    diaries?

5    A.  For paper documents.

6    Q.  Just paper documents?

7    A.  Yes.

8    Q.  Okay.  Now, the search warrant I'm looking at, which is

9    Government's Exhibit 6, that is the document search warrant, do

10   you know what is shown on the face of that?

11   A.  What do you mean?

12          MR. HARMON:  Your Honor, may I approach and provide the

13   witness with a copy of the document?

14          THE COURT:  Yes, if you're going to refer to it.

15   Q.  Do you see that search warrant?

16   A.  Yes.

17   Q.  Okay.  When did you first see it that day?

18   A.  Once Corporal Bartlett brought it to the scene.

19   Q.  Okay.  Before he brought it to the scene, did he call

20   Corporal Stillman and tell him to get another search warrant

21   because y'all had relayed to Bartlett via police radio or

22   telephone that drugs had been found?

23   A.  I can't recall if he was already on the scene or he was

24   still en route to our location, but we did eventually inform him

25   that we were going to have to stop, and he needed to get a drug

1   search warrant.  He needed to get this amended for a drug search

2   warrant.

3   Q.  I'm sorry.  My sinuses are not being good with the

4   antihistamine prescribed me.  Can you repeat that last part

5   again for me?

6   A.  I can't recall if he had finally made it to the residence

7   with the document search warrant or if he was still en route

8   when we found the drugs inside the vehicle.  But we did tell him

9   once we found the drugs that we were going to have to stop, and

10  he needed to get it amended.

11  Q.  Okay.  So you don't know whether he ever arrived to execute

12  the search warrant itself before getting the second one or not?

13  A.  He arrived.

14  Q.  He arrived?

15  A.  I can recall him being there.

16  Q.  Who actually served the search warrant?

17  A.  Any one of us can serve it.

18  Q.  Yes, but who did?

19  A.  Okay.  It probably was Corporal Wright that served it.  He's

20  the one that signed it because he's the evidence officer showing

21  that it was being served before we left the house.

22  Q.  Okay.  And do you know what form that search warrant was

23  in?  Did you see it actually?

24  A.  Did I see it?

25  Q.  The search warrant.

1  A.  Before we left the house?

2  Q.  Yes, ma'am.

3  A.  Yes.

4  Q.  How many pages was the search warrant itself?

5  A.  Should be one page.

6  Q.  One page.  Okay.  If you look at the front of that search

7  warrant, it says, and/or items listed in attachment one and

8  attachment two.  That wasn't attached to the search warrant that

9  you served, was it?

10  A.  Not that I can recall.

11  Q.  It was actually attached to the affidavit that was given to

12  the judge, wasn't it?

13  A.  That's correct.

14  Q.  Okay.  So everything you were searching for was on the face

15  of that one-page search warrant, wasn't it?

16  A.  Everything that we were searching for is on this page and on

17  attachment one and two.

18  Q.  But you didn't have attachment one and two there to refer

19  to, did you?

20  A.  It just goes into more detail concerning what type of

21  records we're looking for and books and notes and ledgers.

22        THE COURT:  But the question is did you have it there

23  at the scene on that day?  Did you have attachments one and two

24  at the scene on that day?

25        THE WITNESS:  He would have had it in his vehicle, so

```
 1   it would have been out there on the scene, but it would not have

 2   been something we would have went by because it's something that

 3   we do every day, so we know what we're looking for.

 4   Q.  Who found the currency under the bed?

 5   A.  That would have been at the time Corporal Wheeler.

 6   Q.  Wheeler?

 7   A.  Yes.

 8   Q.  You didn't see the currency found, did you?

 9   A.  No.

10   Q.  In fact, when you saw it, somebody had already pulled it

11   out, hadn't they?

12   A.  It was -- they left it there, and it was eventually pulled

13   out.

14   Q.  That's not my question.  When you saw it, somebody had

15   pulled it out, hadn't they?

16   A.  Yes.  It was eventually brought up to the front so the

17   evidence officer could log it in as evidence.

18   Q.  You never went in the room and saw where it was found, then?

19   A.  No.

20   Q.  When you were looking for a large amount of currency, the

21   front of that search warrant just says U.S. currency, right?

22   A.  Yes.

23   Q.  Was the plan to take any currency found there, or was there

24   some amount you were looking for?

25   A.  It wasn't a certain amount.  It's U.S. currency that is
```

27

1    indicative of drug proceeds.

2    Q.  Okay.  And who made the determination of whether the

3    amount was large enough to be considered indicative of drug

4    activity?

5    A.  At that time, what we would do is just take it, and then

6    from further investigation determine if it's going to be drug

7    proceeds.

8    Q.  I'm sorry.  You turned away, and I couldn't --

9    A.  We can't make that determination on the scene, so a lot of

10   times we will take it and then determine if it's going to be

11   from drug proceeds.

12   Q.  Okay.  Suppose you only found $200 in fives and tens.  Would

13   you seize that?

14   A.  No.

15   Q.  How about $1,200?

16   A.  No.

17   Q.  How about $3,000?

18   A.  Yes.

19   Q.  At what point do you cross the line from 1,200 to 3,000?

20   A.  It would be about 3,000 on up is what we would seize.

21   Q.  And what do you base that on?

22   A.  It's based on what the courts will accept before they --

23   before they would allow us to file for seizure.

24   Q.  So you decide whether it's enough for you to file a

25   forfeiture or not?

1 A. Yes.

2 Q. Okay.  Now, do you think the courts set guidelines about

3 that, or is it the U.S. attorney that sets the guidelines about

4 that?

5     MR. HARMON:  Your Honor, I object.  This calls for

6 evidence from this witness which she is not qualified to talk

7 about.  It calls for legal opinion.  And further, Your Honor, it

8 would ask for her opinion of guidelines that are adopted by

9 agencies such as DEA and others.

10     THE COURT:  Well, I'll let her testify if she knows

11 where they come from, if it's relevant, but I sustain the

12 objection otherwise.

13 Q. Do you know who sets the number for what y'all seize and

14 what you ought not to?

15 A. The court system.

16 Q. The court system.  Okay.

17   Did you have any particular technique, any kind of testing

18 equipment with you or anything that if you found a $100 bill,

19 you could determine just from the $100 bill whether it was drug

20 money or not?

21 A. No.

22 Q. Did you find any records of drug activity there?

23 A. We collected paper documents, and that would be up to the

24 case agent to determine if any of it is -- can be used as

25 evidence.

1  Q.  So what you do is just take all the documents you can find

2  and take them down and let the case agent go over them later and

3  decide if they're worthless or useful or what?

4  A.  That's correct.

5  Q.  Okay.  Now, how about books, notes, or ledgers?  It's on the

6  front of the search warrant.

7  A.  That's considered all paper documents.

8  Q.  All paper documents.  Okay.  Do you know what kind were

9  seized that day?

10  A.  No.  In order -- if we were to sit there and look all --

11  look at all the paper documents in the house, we would be there

12  for a couple of days.  So we initially look through them and

13  collect what we feel may be needed and then do a thorough look

14  after we get back at the office or let the case agent look at

15  it.

16  Q.  All right.  So you used the search warrant just to go in and

17  get all the paperwork you can find, take it -- seize it, take it

18  in, go over it very carefully and decide what you need and what

19  you don't?

20  A.  Yes.

21  Q.  Okay.  Thank you very much.

22          MR. HARMON:  Your Honor, briefly.  May I approach, Your

23  Honor?

24          THE COURT:  You may.

25                    REDIRECT EXAMINATION

1    BY MR. HARMON:

2    Q.  Sergeant, if you would, I'd like to retrieve my document.

3    Before I do, would you notice there on --

4              MR. MADDOX:  Your Honor, may I approach so I can hear?

5              THE COURT:  You may.

6    Q.  On the front of the search warrant -- that's document 6, the

7    document search warrant -- does it have a time and date when it

8    was issued?

9    A.  Yes, it does.

10   Q.  What is the time and date?

11   A.  The time is 8:40 a.m., and the date is March the 31st of

12   2006.

13   Q.  Okay.  And based upon your prior experience with execution

14   of warrants, is that the time that the warrant was signed and

15   executed by the magistrate?

16             MR. MADDOX:  I object, Judge.  That calls for her to

17   speculate about when the magistrate actually signed it.

18             THE COURT:  I'll sustain.  The document speaks for

19   itself.

20   Q.  Sergeant, one other question.  Regarding the seizure of the

21   money, are you the officer that decided to seize the money on --

22   during execution of these warrants?

23   A.  No.

24             MR. HARMON:  Thank you, Your Honor.  That's all I

25   have.

```
 1            THE COURT:  Sergeant, tell me, when you exited your
 2   car, what were you wearing?
 3            THE WITNESS:  I was wearing my police vest and regular
 4   clothing, civilian clothing.
 5            THE COURT:  Did you drive your car across the street in
 6   front of the house or did you get out of your car from where you
 7   had been observing?
 8            THE WITNESS:  No, I drove my vehicle across the
 9   street -- down the street and kind of veered off to the left
10   because I was on the opposite side of the house.  So I drove a
11   little ways and pulled on the side.
12            THE COURT:  Did you and Officers Wright and Crockett
13   all approach at the same time?
14            THE WITNESS:  Yes.
15            THE COURT:  Just the three of you initially?
16            THE WITNESS:  Yes.
17            THE COURT:  When you exited your vehicle, could you see
18   the house?
19            THE WITNESS:  Yes.
20            THE COURT:  Were the two Mr. Joneses out in the yard at
21   the time you exited your vehicle?
22            THE WITNESS:  Yes.
23            THE COURT:  Did you walk, run --
24            Well, first of all, how far is your vehicle from the
25   house after you moved it from the driveway?
```

```
 1              THE WITNESS:  Once I moved it closer to the house?

 2              THE COURT:  Yes; where you got out.

 3              THE WITNESS:  I was right by the driveway.

 4              THE COURT:  You were right by the driveway.  How many

 5     feet away would the claimant, Mr. George Jones, have been when

 6     you exited your vehicle?

 7              THE WITNESS:  He would have been probably five feet

 8     away.  He wasn't far.  He's going to be on the other side of the

 9     vehicle.  Five, ten -- he's not -- couple of yards.  I'd say

10     about 25 yards away from me.  He's on the other side of the

11     pickup truck.

12              THE COURT:  All right.  Did he ever get to the pickup

13     truck before he ran?

14              THE WITNESS:  He was out in the yard.  They were by the

15     pickup truck, so, yes, he did.

16              THE COURT:  But he was not in the truck?

17              THE WITNESS:  No.

18              THE COURT:  Now, when he ran, were you on the driver --

19     the passenger side of the truck?

20              THE WITNESS:  I was on the driver's side.

21              THE COURT:  When you saw him run, which way did he go?

22              THE WITNESS:  He ran back towards the left side of the

23     house.

24              THE COURT:  Is that away from the truck?

25              THE WITNESS:  Yes.
```

33

```
 1              THE COURT:  And away from you?

 2              THE WITNESS:  Yes.

 3              THE COURT:  And where were Lieutenant Crockett and

 4  Corporal Wright when he began to run?

 5              THE WITNESS:  They were in the yard.

 6              THE COURT:  They were also as close to him as you were

 7  or closer?

 8              THE WITNESS:  They would have been closer.

 9              THE COURT:  Did they say anything to him?

10              THE WITNESS:  I can't recall.

11              THE COURT:  When he ran, did they say anything to him?

12              THE WITNESS COURT:  I can't recall.

13              THE COURT:  When was the last time you saw him when he

14  ran?  What was the last thing you saw?

15              THE WITNESS:  When he ran, my attention shift to Otis

16  Jones.  So after he ran towards the side of the house and they

17  were giving pursuit, my attention, because I was left alone with

18  Otis Jones, shift to him.

19              THE COURT:  And you put him in cuffs?

20              THE WITNESS:  Yes.

21              THE COURT:  How long was it before they returned with

22  George?

23              THE WITNESS:  Probably a minute.

24              THE COURT:  And when they returned with George, had

25  they recovered what they thought to be or you -- appeared to you
```

```
 1   to be a packet of drugs?

 2            THE WITNESS:  Yes.

 3            THE COURT:  Did they share that information with you?

 4            THE WITNESS:  Yes.

 5            THE COURT:  Did all of that happen before you entered

 6   the house?

 7            THE WITNESS:  When they shared it?  No.

 8            THE COURT:  You said he was gone a minute.

 9            THE WITNESS:  He was gone a minute.

10            THE COURT:  And they brought him -- they caught him and

11   brought him back.

12            THE WITNESS:  Yes.

13            THE COURT:  All right.  And then what happened?

14            THE WITNESS:  And then during all that time, that's

15   when I was taking -- once that minute was going on, I was taking

16   Otis Jones into custody.  I had two members of the SWAT team

17   arrived on the scene, and I had one of the SWAT officers watch

18   Otis Jones.  At that time, I went up to the side door to

19   announce police presence and try to determine if anybody else

20   was inside the house.

21            THE COURT:  Had George been brought back by then?

22            THE WITNESS:  No, not that I can recall.

23            THE COURT:  At what point was he brought back?

24            THE WITNESS:  He was brought back -- when I became

25   aware of him is when we got the mother situated and we had
```

1  checked the house.  Might have been brought up back before then,

2  but once we got the mother situated and checked the house,

3  that's when I became aware that he was brought back.

4       THE COURT:  Okay.  So when you searched -- did you take

5  part in searching the house at all?

6       THE WITNESS:  Yes.

7       THE COURT:  And at the time you were searching the

8  house, you did not know whether George had been brought back or

9  not or whether he had drugs on him or not?

10      THE WITNESS:  When I started searching the house?

11      THE COURT:  Right.

12      THE WITNESS:  By the time they brought him back, I was

13  aware -- before I started the searching of the house.

14      THE COURT:  You were not aware?

15      THE WITNESS:  I was aware.

16      THE COURT:  You were aware before you started?

17      THE WITNESS:  Right.  But my attention after we began

18  the search was I went to the truck and started searching the

19  truck.  And then our search warrant stopped for a drug search

20  warrant.  Then eventually when that drug search warrant was

21  approved, I eventually assisted with searching the inside of the

22  house.

23      THE COURT:  Of course, that was two hours later.

24      THE WITNESS:  Yeah.

25      THE COURT:  The second warrant, apparently, was issued

36

1   at 11:25.

2          THE WITNESS:  Yes.

3          THE COURT:  Or so or thereabouts.  So now I'm

4   confused.  My question to you is, when did you become aware that

5   George had been caught and retrieved and actually had drugs on

6   his person or had had drugs on his person?

7          THE WITNESS:  That would have been shortly after we

8   secured that house.

9          THE COURT:  Okay.  Y'all have any other questions?

10          MR. HARMON:  Just very briefly, I did want to ask one

11   thing.

12                    REDIRECT EXAMINATION

13   BY MR. HARMON:

14   Q.  Sergeant, would you describe for the Court the police vest

15   you were wearing when you approached, what it looks like?

16   A.  It's a black vest that has police visible on the front and

17   on the back.

18          MR. HARMON:  That's all I have, Your Honor.

19          THE COURT:  Okay.

20          MR. MADDOX:  If I might, Judge.

21                    RECROSS EXAMINATION

22   BY MR. MADDOX:

23   Q.  It is fair to say that y'all had already found the money at

24   the time you determined that some drugs had been found in or

25   around the premises there?

1    A.    Yes.

2    Q.    Because you stopped searching when the drugs were found to

3    go and get another search warrant, right?

4    A.    Yes.

5    Q.    Okay.  And that's why there's one inventory relating to the

6    document search warrant that shows all the money found, the

7    Glock, the blue cap, and then that search warrant is stopped

8    because drugs were found; is that right?

9    A.    The drugs should also be included on that one.

10    Q.    I could not hear you.

11    A.    The drugs also should be included on that warrant itself.

12    We found the money, the drugs that was in the cap, and the

13    Glock.

14    Q.    Okay.

15          MR. MADDOX:    Your Honor, may -- I find that I need to

16    offer an exhibit.  Could I have this marked?

17          THE COURT:    You may.  Is that the inventory?

18          MR. MADDOX:    It is the inventory, Your Honor.

19          THE COURT:    Just mark it Plaintiff's 1.

20          MR. MADDOX:    May I approach the witness?

21          THE COURT:    You may.

22    Q.    Sergeant, is this the inventory for the first search

23    warrant?

24    A.    Yes.

25    Q.    What does it show you had collected at the time you stopped

1    it?

2    A.  Number one is going to be assorted U.S. currency.  Number

3    two is one Glock 9 millimeter.  Number three is a ball cap

4    containing two clear plastic bags -- yeah -- with cocaine.

5    Q.  Now, the ball cap with two plastic bags with cocaine, where

6    was it found?

7    A.  In the truck.

8    Q.  In the truck.  And the money that had already been found

9    that was listed first, where was that found?

10   A.  In the house.

11   Q.  And how much money is listed there?

12   A.  $74,700.

13          MR. MADDOX:  Offer Plaintiff's Exhibit Number 1, Your

14   Honor.

15          MR. HARMON:  No objection, Your Honor.

16          THE COURT:  Offered over no objection.

17          MR. MADDOX:  No more questions, Your Honor.

18          MR. HARMON:  Your Honor, if I might very briefly

19   approach the witness.

20          THE COURT:  You may.

21                         REDIRECT EXAMINATION

22   BY MR. HARMON:

23   Q.  Sergeant, the document that Mr. Maddox just introduced, does

24   it show the time of entry of that document warrant?

25   A.  Yes.  At nine o'clock in the morning.

```
 1   Q.  Thank you, ma'am.

 2       That's all I have, Your Honor.

 3           THE COURT:  When you say time of entry, that would have

 4   been the entry of what?

 5           THE WITNESS:  The house.

 6           THE COURT:  Okay.

 7           MR. HARMON:  Your Honor, I have no further questions.

 8   I'd ask that this witness be excused.

 9           MR. MADDOX:  No need to keep her, Judge.

10           (Witness excused.)

11           MR. HARMON:  Your Honor, if I may be excused, I'll go

12   call my next witness.

13       PATRICK CROCKETT, the witness, having been duly sworn,

14   testified as follows:

15                         DIRECT EXAMINATION

16   BY MR. HARMON:

17   Q.  Sir, would you state your name, please, and spell your first

18   and last names.

19   A.  Lieutenant Patrick, P-A-T-R-I-C-K, Crockett,

20   C-R-O-C-K-E-T-T.

21   Q.  And how are you employed, sir?

22   A.  City of Montgomery, Montgomery Police Department.

23   Q.  And how long have you been so employed?

24   A.  Seventeen years and 11 months.

25   Q.  Sir, I would direct your attention to the date of the 31st
```

PATRICIA STARKIE, RDR, CRR, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, MIDDLE DISTRICT OF ALABAMA
ONE CHURCH STREET, MONTGOMERY, AL 36104   334-262-1221

1  of March of 2006, and specifically the execution of a warrant at

2  an address on West Shades Valley in Montgomery, Alabama.  Do you

3  recall that day?

4  A.  Yes, sir.

5  Q.  Can you tell the Court what you were -- what your initial

6  effort or -- excuse me -- your initial duty was there at that

7  location?

8  A.  As a lieutenant, I was over Sergeant Wright and the

9  second-shift narcotics officers.  They came to me and said that

10  they were going to conduct a document -- wanted to conduct a

11  document search warrant at the West Shades Valley address.

12  Q.  And did you proceed to that location?

13  A.  Yes, sir.

14  Q.  Where were you initially located in the course of executing

15  this warrant?

16  A.  Sergeant Wright maintained surveillance on the residence.  I

17  was right down the street from it on Greensboro, Southlawn Drive

18  area, as support for her because she had eyes on the residence.

19  Q.  Was there a reason, sir, that you were not in closer

20  proximity to the Shades Valley residence?

21  A.  I was -- I would have stood out.  I wanted to be close by

22  and be able to respond, but she had eyes on the residence.

23  Q.  During the course -- did you receive any information from

24  Sergeant Wright during this -- during the course of her

25  surveillance?

1  A.  Yes, sir.

2  Q.  What did she tell you?

3  A.  She called on the radio and said we had -- she had activity

4  there.  One vehicle had just left; a female had just left.  It

5  was followed, got stopped.  She was identified.  Sergeant Wright

6  then notified us that another vehicle with a black male showed

7  up, a truck, I believe, and that there was two subjects standing

8  out in the front yard.

9  Q.  Now, did you eventually receive word that the requested

10  document search warrant had been obtained?

11  A.  Yes, sir.

12  Q.  And what did you do as a result of that?

13  A.  As a result, I advised my units to start moving in to

14  conduct the document search warrant.

15  Q.  And what was the first thing you saw when you arrived at

16  that location?

17  A.  Myself and Shon -- Corporal Shon Wright was behind me.  I

18  exited -- when we pulled up in front of the residence, I exited

19  my vehicle along with Corporal Wright.  The subject with the

20  patch over his eye ran from the residence to the back of the

21  residence.  Myself and Corporal Wright began foot chase of that

22  subject.

23  Q.  Let me make sure that we all understand.  You're talking

24  about Corporal Shon Wright.  That is not the same person as

25  Sergeant Vanessa Wright, is it?

1  A.  No, sir.  Two separate --

2  Q.  Do you see in the courtroom the individual whom you saw run

3  from you that day?

4  A.  Yes, sir.

5  Q.  Would you identify him, please.

6  A.  He's at the defense table.

7         MR. HARMON:  And would the Record reflect that the

8  witness has correctly identified the claimant.

9  Q.  Before I go any further, how were you dressed?

10  A.  I had on jeans, a pullover shirt with my vest -- a pullover

11  vest, throw-over vest with police on the front, police on the

12  back.  It's a black vest with, like I said, police on the front

13  and on the back.

14  Q.  Were you wearing a mask?

15  A.  No, sir.

16  Q.  And can you describe for the Court how Shon Wright was

17  dressed.

18  A.  He was dressed in a suit.  He had -- he pulled his mask on,

19  and I believe he had his throw-over vest underneath his jacket

20  that had police on it.

21  Q.  Could you -- for example, could anyone seeing you approach

22  them, could they see that you had --

23  A.  It's like --

24  Q.  -- police written on it?

25  A.  Yes, sir.  It's open.

1  Q.  I know you said you saw George Jones in the yard.  What was

2  the first thing you saw him do?

3  A.  He started -- he turned -- when he saw us get out of the

4  truck, he turned and ran behind the house.

5  Q.  And what did you do at that point?

6  A.  I gave foot chase.

7  Q.  And did anyone assist you in the chase?

8  A.  Corporal Wright assisted.

9  Q.  Can you describe the chase, how long it lasted and where it

10  ended up?

11  A.  We jumped the back fence -- he jumped the back fence.

12  Corporal Wright passed me.  I slowed up to make sure the

13  house -- there was nobody in the back of the house to ambush us

14  or anything.  I slowed up, made sure nobody was there, and I

15  kept -- Corporal Wright got in front of me, and I got behind

16  Corporal Wright.

17  Q.  Now, when you say he -- that George Jones jumped the fence,

18  was it a fence at the back property line?

19  A.  It was the back property line, the fence.  We jumped it.  He

20  turned to the left, and I believe two houses down is where we

21  caught up to him and caught him.

22  Q.  Now, who was the person initially that put hands on

23  Mr. Jones?

24  A.  Corporal Wright.

25  Q.  I know you described that you initially checked the back of

1  the Shades Valley property to insure your safety.  After that

2  point, did you have a clear observation of the entire chase?

3  A.  Once he made it over the fence and he got behind the tree, I

4  didn't see him and Corporal Wright until I got behind it.  I

5  lost sight of them maybe fractions of a second.

6  Q.  Did you regain sight of Mr. Jones and Shon Wright during the

7  chase after they cleared the tree area?

8  A.  Yes, sir.

9  Q.  What did you see happen?

10  A.  That's when he was pulling something -- a bag out of his

11  pocket, out from his pants.  And it was a white -- or plastic

12  bag with white powder in it, and that's when we took him into

13  custody.  He threw it out, and when it hit the ground was when

14  we got him in custody.

15  Q.  And that would -- when you say someone took it out of their

16  pants, who would that individual have been?

17  A.  The defendant.

18  Q.  Can you identify him by name?

19  A.  Jones.  George Jones.

20  Q.  And that's the same individual that you earlier identified;

21  is that correct?

22  A.  Yes, sir.

23  Q.  Now, how close was the --

24  Let me back up and ask it like this.  When you recovered the

25  item that Mr. Jones had thrown down, how close was it to the

1    location where you and Corporal Wright obtained control of

2    Mr. Jones' person?

3    A.  It was within two to three feet.  Might have been -- you

4    know, it wasn't any further than five feet, but it was right

5    there with us.

6    Q.  Who was the person who initially picked up the package that

7    Mr. Jones had discarded?

8    A.  I believe Corporal Wright picked it up.

9    Q.  Did you get a good -- Excuse me.  Go ahead.

10   A.  We got him in custody.  Got cuffs on him.  Corporal Wright

11   reached over, picked it up, I've got this, and we started

12   walking back to the residence.

13   Q.  Did you get a close look at the item?

14   A.  Yes.

15   Q.  Can you describe it, please, what --

16   A.  White powder in a plastic bag.  Appeared to be powder

17   cocaine.

18   Q.  How long did the chase last after your initial approach to

19   the Shades Valley property?

20   A.  Maybe two minutes, if that.  It wasn't that long.

21   Q.  Did you then begin to assist an execution of a document

22   search warrant?

23   A.  Yes, sir.

24            MR. HARMON:  Your Honor, may I approach the witness?

25            THE COURT:  You may.

46

1   Q.   Sir, I'm going to show you what has been marked for

2   identification purposes as Government's Exhibit 1.   Will you

3   take a look at that, please, sir.

4   A.   Yes, sir.   This is wrappers, cellophane wrappers with black

5   tape that was up underneath the bed in a back room.   It was

6   identified as George Jones' back room.

7   Q.   Did you notice anything of interest about this item when you

8   first saw it?

9   A.   It smelled of raw cocaine, and there was powder residue on

10   the package, on the cellophane.

11   Q.   Sir --

12          MR. HARMON:   At this time, Your Honor, I'm going to

13   offer into evidence Government Exhibit 1.

14          THE COURT:   Any objection?

15          MR. MADDOX:   No, objection, Your Honor.

16          THE COURT:   It's admitted over no objection.

17   Q.   Sir, if you will, take a look at Government's Exhibit 2,

18   please.

19   A.   Cellophane.   Once again, it's the cellophane wrapper with

20   like a plastic bag around it that was up underneath the couch.

21   It's a rollaway couch bed that was in the room.

22   Q.   And what room -- was this in the --

23   A.   Same room.

24   Q.   -- same room?

25          MR. HARMON:   Your Honor, I'm going to ask that

**GOVERNMENT'S EXHIBIT**
**9**

PATRICIA STARKIE, RDR, CRR, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, MIDDLE DISTRICT OF ALABAMA
ONE CHURCH STREET, MONTGOMERY, AL 36104   334-262-1221

```
 1   Government's Exhibit 2 be admitted into evidence.

 2            THE COURT:  Any objection?

 3            MR. MADDOX:  I couldn't hear what he said.

 4            THE COURT:  He's offering Government's Exhibit 2.

 5            MR. MADDOX:  No objection.

 6            THE COURT:  Admitted over no objection.

 7   Q.  And what did you do with these two items, sir, when you

 8   recovered them?

 9   A.  They were given to Corporal Wright, the evidence officer.

10   Q.  Will you answer Mr. Maddox's questions, please.

11   A.  Yes, sir.

12            MR. MADDOX:  May I approach the witness with those

13   exhibits a moment?

14            THE COURT:  You may.

15            MR. HARMON:  Mr. Maddox has a copy, Your Honor.

16                         CROSS EXAMINATION

17   BY MR. MADDOX:

18   Q.  Lieutenant Crockett, who found the money under the bed?

19   A.  I believe at the time, it was Sergeant Wheeler that found

20   the money under the bed.

21   Q.  What's his first name?

22   A.  Todd Wheeler.

23   Q.  Okay.  So if the inventory showed TW beside the money, that

24   would explain that, wouldn't it?

25   A.  Yes, sir.
```

1  Q.  Okay.  Now, while you were running, do you know what was

2  going on at the house?

3  A.  No, sir.

4  Q.  You said you chased for about two minutes.  What happened

5  after y'all caught him after that two-minute run?

6  A.  We took him in -- he was on the ground.  We took him into

7  custody, handcuffed him.  I had to with another officer walk him

8  around.  Instead of going over the fence and through the back

9  yards, we walked down the street and around to West Shades

10  Valley.

11  Q.  So it took a bit longer than the two minute chase to go

12  back, then, didn't it?

13  A.  Yes, sir.

14  Q.  Okay.  Now, were there other people in that yard when you --

15  y'all caught up with him?

16  A.  In which yard?

17  Q.  Where you caught up with him.

18  A.  Where we caught up with him?

19  Q.  Yes, sir.

20  A.  I believe there was an elderly gentleman that was there,

21  that was standing out that might have heard the commotion.  I

22  don't know if anybody else was there.

23  Q.  That's all you recall, though?

24  A.  Yes, sir.

25  Q.  All right.  Let me back up.  When you first started to

1   approach, were you with Shon Wright or did y'all come from

2   separate directions?

3   A.  We were in two different vehicles.

4   Q.  Okay.  So y'all would have been coming at slightly different

5   angles, so to speak?

6   A.  Yes, sir.

7   Q.  When you first saw -- just before you approached, you saw

8   George Jones and Otis Jones in the yard near the truck?

9   A.  Yes, sir.

10  Q.  Which side of the truck were they on?

11  A.  I don't think -- they were right there close to the truck.

12  They were close, like they were about to either get into the

13  truck or walking beside the truck.

14  Q.  Okay.

15  A.  Coming out from the side of the residence.

16  Q.  Okay.  And so they were about to get into it or walking

17  beside it?

18  A.  Yes, sir.

19  Q.  All right.  Which direction was George Jones facing in

20  relation to you when you first saw him walking like that?

21  A.  He was walking from the house, so he was facing me when he

22  was coming in.

23  Q.  Okay.

24  A.  And it might have been east.  I want to say east, but I'm

25  not sure.

1  Q.  Okay.  And to which side of you was Wright when he started

2  approaching?

3  A.  He was -- Corporal Wright?  He was behind me, I want to say,

4  in a truck.  When we pulled up, I got out from the driver's

5  side of the truck, and I was on the -- in the street when I got

6  out of my truck.  So I had to run around my truck to approach

7  them.

8  Q.  Okay.  But was Wright in front of you, behind you?

9  A.  He was behind me.

10  Q.  Behind you.  All right.

11      Now, you said that he was wearing a suit?

12  A.  Yes, sir.

13  Q.  Wearing his police vest under his jacket?

14  A.  Yes, sir.

15  Q.  And he had a mask on?

16  A.  Yes, sir.

17  Q.  Did he have his gun out?

18  A.  No, sir.

19  Q.  Did you have a gun out?

20  A.  No, sir.

21  Q.  Okay.  What part did you take in the search of the house?

22  A.  Once we got back to the house, I made sure all of my

23  officers was okay; everybody was fine.  I immediately walked

24  back.  When I started walking back, they said, we found --

25  there's money under the bed.  I was like, okay.  Well, we've got

1    narcotics here.    I believe it's cocaine.    At that point, they

2    said -- or, you know, wait a minute.    We've got narcotics.    We

3    need to stop and get a drug search warrant instead of a document

4    search warrant.

5    Q.    All right.    So at the time y'all informed them that you had

6    found narcotics, they had already informed you they had found

7    money?

8    A.    Yes, sir.

9    Q.    Okay.    Now, the search warrant itself, did you see it when

10    you went to serve it?

11    A.    No, sir.

12    Q.    Who had the search warrant when y'all went there to serve

13    it?

14    A.    Corporal Brad Bartlett.

15    Q.    Okay.    Was he there?

16    A.    No, sir.    He was on the way.

17    Q.    Okay.    Do you know what the search warrant authorized?

18    A.    It was a document warrant.    It was not a drug search

19    warrant.

20    Q.    Do you know where it authorized to search?

21    A.    No, sir.

22    Q.    Do you know what it authorized you to search for?

23    A.    It was for the residence that we were at.

24    Q.    Well, let me say it in a different way.    Do you know what

25    particular items you were supposed to look for when you searched

1    the residence?

2    A.  Yes, sir.

3    Q.  What?

4    A.  Money, any documents for drug activity, any documents from

5    drug sales or anything of that nature.

6    Q.  You mean like receipts or --

7    A.  Yes, sir.

8    Q.  Okay.  Do y'all see a lot of receipts in the drug trade?

9    A.  If there -- I've seen people write down what people owe them

10   on a notebook and how much money --

11   Q.  Like a name and a number?

12   A.  Yes, sir.

13   Q.  Did y'all find any of that at that house?

14   A.  Not that I can recall.

15   Q.  Okay.  Who actually first laid hands on Mr. Jones?

16   A.  I believe Corporal Wright.  I did not.  Corporal Wright was

17   in front of me.

18   Q.  He got ahead of you?

19   A.  Yes, sir.

20   Q.  And why were y'all chasing Mr. Jones?

21   A.  He ran from the residence.

22   Q.  Well, he was already outside the residence when y'all showed

23   up, wasn't he?

24   A.  Yes, sir.

25   Q.  And did you have a warrant to search him, too?

53

```
 1   A.  If we're doing a document search warrant, and if somebody

 2   runs from the house, yes, sir, I'm going to -- I want that

 3   subject.

 4   Q.  Yes, sir.  To clarify, he didn't run from the house, did he?

 5   A.  He ran from the front yard of the house.

 6   Q.  He strolled out to the truck, and when he saw y'all running

 7   toward him, he ran away; is that accurate?

 8   A.  Yes, sir.

 9   Q.  Okay.  That's all.  Thank you.

10        MR. HARMON:  I have nothing further, Your Honor.  Ask

11   that this witness be excused.

12        THE COURT:  Yes.

13        (Witness excused.)

14        MR. HARMON:  Your Honor, may I be excused to call my

15   next witness?

16        THE COURT:  Who is your next witness?

17        MR. HARMON:  Detective Shon Wright.

18     SHON WRIGHT, the witness, having been duly sworn, testified

19   as follows:

20                    DIRECT EXAMINATION

21   BY MR. HARMON:

22   Q.  Sir, would you state your full name, please, and spell your

23   first and last name.

24   A.  Detective S.T. Wright.  That's S-H-O-N, W-R-I-G-H-T.

25   Q.  And how are you employed, sir?
```

```
 1  A.  With the city of Montgomery.

 2  Q.  In what capacity are you employed?

 3  A.  I'm a vice narcotics officer.

 4  Q.  And you have a title or a rank?

 5  A.  Detective.

 6  Q.  And how long have you been with the Montgomery Police

 7  Department?

 8  A.  Going on ten years.

 9  Q.  Detective Wright, I'm going to direct your attention to the

10  date March the 31st of 2006, and specifically the execution of a

11  warrant at a West Shades Valley residence on that occasion.  Do

12  you recall that event?

13  A.  Yes, sir.

14  Q.  Where were you initially in the course of execution of the

15  warrant?

16  A.  Once I heard it come on the radio, I had just left court,

17  and I was headed out that way.

18  Q.  Let me interrupt you.  I apologize.  I should have asked

19  that differently.  What I meant to ask you, sir, your initial

20  approach to the residence, where did you set up initially before

21  you execution of the warrant?

22  A.  Before the warrant, I was outside the neighborhood before

23  the actual warrant took place.

24  Q.  How far away were you?

25  A.  I think probably about a block or so away.
```

55

1  Q.  Is there any particular reason that you would have set up

2  that location that far away from the residence?

3  A.  So I wouldn't be seen.

4  Q.  Did you become -- what was the next thing that happened

5  after you established your location there?  What was the next

6  thing that happened in the course of the execution of the

7  warrant?

8  A.  When they advised that they had a search warrant that was

9  signed, and the subject had just pulled up and about to come

10  out, I put on my vest and mask and started slowly moving in

11  towards the residence.

12  Q.  Now, let me ask you this.  What were you wearing when you

13  approached the residence to execute the warrant?

14  A.  I had on a similar suit, but it was blue.  I had on my vest

15  that's underneath that clearly said police, police officer,

16  police, and then I had on my mask that clearly said police.

17  Q.  Now, if I was looking at the vest you had on, could you see

18  the word police if you approached someone, if you were

19  approaching someone?

20  A.  When I got out, I pulled it back, and you could see it.

21  Q.  And I think you said you had a mask on.  Did it have police

22  written on the mask?

23  A.  Correct.

24  Q.  What was the first thing you saw when you arrived at the

25  Shades Valley address?

1   A.   Once I pulled up, the subject was coming from the residence,

2   the side door of the residence, about to enter a vehicle.  At

3   that time I got out of the vehicle, and the subject took off

4   running.

5   Q.   Do you recognize that individual in the courtroom?

6   A.   Yes.  Sitting over there.

7   Q.   Would you identify him, please, sir.

8   A.   The gentleman with the patch over his eye.

9        MR. HARMON:  Let the record reflect that the witness

10  has correctly identified the claimant as the individual he saw

11  running.

12  Q.   What did you do at that point?

13  A.   After he took off running, I gave chase on him.

14  Q.   And did anyone assist you in the chase?

15  A.   Lieutenant Crockett.  I believe he was behind me.  I didn't

16  notice him until we actually got up on the guy.

17  Q.   Okay.  Now, what did Mr. Jones do during the course of his

18  flight?

19  A.   He went through the back yard of his residence.  He jumped

20  the fence, went through that yard, came out on the other street

21  in front of the house behind him, turned left and went probably

22  a house over, and started to go back into the backyard.  At the

23  same time, he was reaching -- I believe into his left pocket and

24  attempting to, I guess -- I don't know if he was trying to grab

25  something or whatever.  As he came around to the back side of

57

1  the house, his pants were somewhat coming down.  So at that

2  time, as I started to catching him, he started tripping and he

3  was pulling an object out of his pocket.

4  Q.  Did you see the object he pulled out of his pocket?

5  A.  Yes.

6  Q.  What did he do with it?

7  A.  He tried to fling it to get rid of it.

8  Q.  And did he actually throw it away?

9  A.  He threw it as he was falling.  He threw it like it was

10  coming out this way (indicating).

11  Q.  And at that point, did you get custody of Mr. Jones?

12  A.  Myself and Lieutenant Crockett took him into custody.

13  Q.  How far away was the object he had taken from his pants and

14  attempted to throw away?  How far away was that?

15  A.  It wasn't far, because as he fell, it was just like

16  sprinkled like in front of him.  Not real far.

17  Q.  Can you describe the item that Mr. Jones had attempted to

18  throw away?

19  A.  It was a white powdery substance.

20  Q.  How was it packaged?

21  A.  It was in like a, as you say, sandwich bag, clear plastic

22  bag.

23  Q.  What did it appear to be to you?

24  A.  Cocaine.

25  Q.  Would it have been like rock cocaine or powder cocaine?

1    A.    Powder.

2    Q.    Did you pat down Mr. Jones at the time you got custody of

3    him?

4    A.    I think myself and Lieutenant Crockett did.    I mainly

5    grabbed all the cocaine and started getting up as much as I

6    could.

7    Q.    Do you know if any other items were recovered from Mr. Jones

8    at that time?

9    A.    Not that I'm aware of.

10    Q.    And what did you do with Mr. Jones at that time?

11    A.    I believe we -- I believe -- I'm not for sure.    I believe

12    that he was transported back around to the house by one of the

13    SWAT units, and we just jumped the fence and got back over to

14    the house.

15    Q.    Did you participate in the execution of the warrant there at

16    the house?

17    A.    I didn't participate in the actual execution, because it was

18    going on as we was in foot pursuit.

19    Q.    Did you recover any item during the course of the warrant?

20    A.    I was the evidence officer, so all the evidence was brought

21    to me and I documented everything.

22    Q.    Would you explain to the Court what an evidence officer

23    does.

24    A.    What the evidence officer does is he collects all the

25    evidence which is found in the house according to the search

1  warrant that is issued.

2  Q.  And very briefly, tell the Court how that's done as far as

3  them bringing your -- an item to your attention so that you can

4  record its recovery.

5  A.  Basically, if they find it, once the search warrant, they

6  had cleared the residence, they go inside and they start

7  searching.  As they find it, they bring it back to me, and I log

8  it in, the time, the person that located it, and where they

9  located it at.

10  Q.  Would you answer Mr. Maddox's questions, please, sir.

11  A.  Yes, sir.

12                         CROSS EXAMINATION

13  BY MR. MADDOX:

14  Q.  Corporal Wright, is Mr. Bartlett here today?

15  A.  I haven't seen him, sir.

16  Q.  Do you know whether he told the judge when he was obtaining

17  this search warrant about the fact that he had been found --

18  given misleading information in other search warrants?

19              MR. HARMON:  I object on relevancy grounds, Your Honor.

20              THE COURT:  Sustained.

21  Q.  The point in time that you started to approach the claimant,

22  Mr. Jones, in this case, George Jones, where was he?

23  A.  He was approaching the driver's -- the passenger door of a

24  pickup truck.

25  Q.  Okay.  And where was Otis Jones?

60

```
 1   A.   I did not -- I concentrated on the person I first saw, so I

 2   don't know where Otis Jones was.  I believe he was on the

 3   driver's side of the vehicle, I believe.

 4   Q.   Getting into the vehicle?

 5   A.   I believe he was getting in the vehicle.  I'm not for sure.

 6   Q.   All right.  Now, we have in evidence as Claimant's Exhibit

 7   Number 1 the inventory that you filled out at the initial search

 8   warrant.  You did do that, didn't you?

 9   A.   That is correct.

10   Q.   The money and the Glock pistol and a blue cap with clear

11   plastic bags?

12   A.   That's correct.

13   Q.   Where was the Glock found?

14   A.   I believe it was found up underneath the seat of the

15   vehicle.

16   Q.   In the vehicle?

17   A.   I believe so, yes.

18   Q.   And the blue cap with cocaine was found in the vehicle

19   also?

20   A.   I believe -- I'm not for sure where that was found.  I would

21   have to see the actual inventory.

22            MR. MADDOX:  May I approach, Your Honor?

23            THE COURT:  You may.

24   Q.   Is that your inventory?

25   A.   Yes, this is my inventory.
```

61

1  Q.  All right.  Can you tell from that inventory where the

2  cocaine was found?

3  A.  It was found in the toolbox.  There was a toolbox on the

4  rear of the vehicle that you have to unlock and open that you

5  sit your tools down.  You know how you have a pickup truck and

6  you have a box on the back?

7  Q.  That's Otis Jones' vehicle, right?

8  A.  I believe so.

9  Q.  And that's the same vehicle the Glock was found in?

10  A.  That is correct.

11  Q.  Okay.  As you were headed toward George Jones and when he

12  started to run, which part of his body was facing you?

13  A.  I believe as he was -- he was coming -- he was like -- I was

14  like a side view, because I was parked like in front of the

15  mailbox.  I'm here, and here's the mailbox.  He was coming from

16  the side door towards the vehicle.  As he got to the vehicle, it

17  was like a side view.

18  Q.  So it would be the left side?

19  A.  If you could turn slightly to your left -- your right?

20  Q.  Like this?

21  A.  Like you about to get -- I had a view such as that.

22  Q.  All right.  So you were on his patch side; is that --

23  A.  Correct.

24  Q.  Okay.

25  A.  But as he turned and looked at me, as I identified myself,

62

1  he saw me clearly.

2  Q.  Did you yell something?

3  A.  Yes.

4  Q.  Who else was approaching him or Otis Jones at that time?

5  A.  I know Lieutenant Crockett was right there in front of me.

6  Q.  In front of you?

7  A.  I was behind him.

8  Q.  Was he --

9  A.  Behind.

10  Q.  Was he saying anything?

11  A.  He was saying the same thing, police.

12  Q.  So y'all were both yelling police at the same time?

13  A.  Yes.

14  Q.  Okay.  At the time you approached, had you seen the search

15  warrant?

16  A.  I had not seen it, sir.  I had just came from court.  I

17  didn't see anything.  I was just going to assist.

18  Q.  Okay.  And you didn't know what it authorized you to search,

19  then, did you?

20  A.  I mean, common search warrants, you know, almost pretty much

21  the same.  This was supposed to have been, as I heard, a

22  document search warrant.

23  Q.  So y'all pretty much get the same search warrant from city

24  judges every time?

25  A.  It differs in some ways, yes.

1  Q.  Okay.  What did you think it authorized you to search?

2  A.  The residence, the premises, you know.

3  Q.  Vehicles?

4  A.  Yes.

5  Q.  People?

6  A.  Yes.

7  Q.  Okay.  Did you know what you were looking for?

8  A.  I mean, like I said, when I first got there, I really didn't

9  know what the actual search warrant was for.  Just a document

10  search warrant.  That's what I heard.

11  Q.  Okay.  And what did you understand that to mean you were to

12  look for?

13  A.  Documents.

14  Q.  Documents?

15  A.  Yes.

16  Q.  Anything more specific than just documents?

17  A.  I have to read over what's in the actual search warrant.

18  Q.  I'm asking you what you knew.

19  A.  What do I usually search?

20  Q.  No.  What did you know that day since you haven't seen the

21  search warrant?

22  A.  Anything within the curtilage of that residence.

23  Q.  And within the curtilage of that residence, you were looking

24  for just documents?

25  A.  Correct.

1  Q.  All right.  Thank you.

2        MR. HARMON:  I have nothing further, Your Honor, but I

3  did want to ask one question I neglected to ask earlier just to

4  clarify.

5                    REDIRECT EXAMINATION

6  BY MR. HARMON:

7  Q.  When you approached Mr. Jones, you were telling him you were

8  a police officer; is that correct?

9  A.  Correct.

10  Q.  And did you hear Mr. Crockett saying the same thing?

11  A.  I heard him say it also.

12        MR. HARMON:  That's all the questions I have, Your

13  Honor.

14        MR. MADDOX:  May I ask one more question, Judge?

15        THE COURT:  You may.

16                    RECROSS EXAMINATION

17  BY MR. MADDOX:

18  Q.  Do you know who actually served the physical copy of that

19  search warrant on anybody at that house?

20  A.  Was it actually served?  I think it was actually given to

21  the mother.

22  Q.  By whom?

23  A.  I believe by myself, because I actually -- I believe,

24  Because I actually -- the search warrant is actually put into a

25  box and is actually -- actually with the actual inventory.  And

65

1  during the process, she got a copy of it.  But at the end of the

2  day, she has a copy of that and the inventory sheet showing her

3  what was taken from the residence.

4  Q.  All right.  And was it two pages, then, or three?  The

5  search warrant and the inventory.  How many pages did that

6  constitute?

7  A.  I'm going to believe it was two.

8  Q.  Just the one-page search warrant with the inventory as the

9  second page?

10 A.  I believe.  I'm not for sure that day.

11 Q.  All right.  Who served the second search warrant?

12 A.  I'm not for sure.

13 Q.  Okay.

14 A.  If anything, it would have been me, because everything comes

15 down to -- at the end of the day, the search warrant, she gets a

16 copy of both search warrants.  She should get a copy of both

17 search warrants and then a copy of the inventory sheets.  So I'm

18 believing, if that's what you're asking, she got a copy of two

19 search warrants.  She got a copy of two inventory sheets.

20 Q.  You can't personally say that you actually recall it,

21 though, can you?

22 A.  That long ago, no, sir.

23 Q.  All right.  Thank you.  That's all.

24        MR. HARMON:  Your Honor, may this witness be excused?

25        THE COURT:  I have a couple of questions.

1          MR. HARMON:   Yes, sir.

2          THE COURT:   Were you Corporal Wright at that time?

3          THE WITNESS:   Corporal, detective.   Same thing.

4          THE COURT:   Same thing?

5          THE WITNESS:   Yes, sir.

6          THE COURT:   All right.   Give me your best estimate of

7    the distance of the chase in yards, just compared to a football

8    field or whatever you want to say.   You ran in the backyard,

9    over the fence, through another yard to another street, two

10   houses down that street, and then to the backyard of that

11   house.   Is that the way it happened?

12         THE WITNESS:   Okay.   If his house was here, you have a

13   house directly behind him.

14         THE COURT:   Right.

15         THE WITNESS:   So probably from where the truck was in

16   the driveway to the front of that house where he took a left and

17   went back, I would say that's probably about 35, 40 yards give

18   or take.   He took a left in front of the two houses, so that's

19   another maybe 30 more yards.   And as soon as he took that next

20   left, like he was headed back towards the residence, that's when

21   no more than probably about 10 -- 7, 10 yards.

22         THE COURT:   7 to 10?

23         THE WITNESS:   7 to 10 yards, give or take.

24         THE COURT:   So at the outside, it would be 40, 30, and

25   10, would be 80 yards?

```
 1              THE WITNESS:  Give or take, yes, sir.

 2              THE COURT:  Running hard and fast?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Now, when you got him on the ground, did he

 5   stop and let you catch him or did you just -- he tripped over

 6   his pants?

 7              THE WITNESS:  He was tripping as I grabbed ahold of

 8   him.

 9              THE COURT:  How long did it take you to cuff him?

10              THE WITNESS:  Didn't take long at all.

11              THE COURT:  Did you take time to read his rights or do

12   any other kind of investigation there where you stopped him?

13              THE WITNESS:  No, sir.

14              THE COURT:  All right.  So you basically cuffed him,

15   stood him up, gathered up the evidence, and somebody --

16              THE WITNESS:  Transported him back.

17              THE COURT:  -- transported him back.  You said you went

18   back the back way?

19              THE WITNESS:  I jumped over the fence.

20              THE COURT:  Went back over the fence?

21              THE WITNESS:  Yes, sir.

22              THE COURT:  So from the time the chase started and the

23   time you got back to the house, which would have been less than

24   100 yards, how long would that have been?

25              THE WITNESS:  Judge, I really -- I mean, it was pretty
```

```
 1  quick.  It was happening so quick, I couldn't tell you.  I mean,

 2  it was just quick.  After he jumped the fence and we ran and ran

 3  and -- it was just quick.

 4          THE COURT:  Okay.

 5          THE WITNESS:  I couldn't tell you exactly how long it

 6  was.

 7          THE COURT:  All right.  That's all I have.

 8          MR. HARMON:  Nothing further from the United States,

 9  Your Honor.

10          THE COURT:  I'm sorry?

11          MR. HARMON:  Nothing further from the United States.  I

12  ask the witness be excused.

13          THE COURT:  Okay.  He may be excused unless there is an

14  objection.

15          (Witness excused.)

16          MR. HARMON:  We would call Todd Wheeler.

17      TODD WHEELER, the witness, having been duly sworn,

18  testified as follows:

19                      DIRECT EXAMINATION

20  BY MR. HARMON:

21  Q.  Sir, would you state your name, please.

22  A.  Todd Wheeler.

23  Q.  Would you spell your first and last name?

24  A.  T-O-D-D.

25  Q.  And last name?
```

GOVERNMENT'S
EXHIBIT
9
PENGAD 800-631-6989

```
1  A.  W-H-E-E-L-E-R.

2  Q.  And where are you employed, sir?

3  A.  Montgomery Police Department.

4  Q.  What's your rank there?

5  A.  Lieutenant.

6  Q.  How long have you been employed with the Montgomery Police

7  Department?

8  A.  Almost ten years.

9  Q.  Sir, I'm going to direct your attention to March the 31st of

10 2006, and specifically in the execution of a search warrant or

11 warrants, I should say, at a Shades Valley address in

12 Montgomery, Alabama.  Do you recall that date?

13 A.  Yes, sir.

14 Q.  What was your job on that occasion?

15 A.  I'm primarily a SWAT officer, so I was primarily there as

16 backup for narcotics officers.  They were relatively short that

17 day, so when they executed the document search warrant, I was

18 going to be an additional body to help them clear the residence.

19 Q.  And you say they were relatively short.  You mean as far as

20 personnel?

21 A.  As far as personnel numbers.  That's correct.

22 Q.  Did you recover items during the course of the execution of

23 these warrants?

24 A.  Yes, I did.

25         MR. HARMON:  Your Honor, may I approach this witness?
```

1          THE COURT:  You may.

2   Q.  I'm going to show you, sir, what's been marked for

3   identification as Government's Exhibit 3.  Would you take a look

4   at that, please, sir.  Do you recollect that -- the items

5   depicted therein?

6   A.  No, I don't.

7   Q.  Let me see, then.  Let me show you what's marked as

8   Government's Exhibit 4.  Do you recollect that item?

9   A.  Yes, I do.

10  Q.  Where was that located to your recollection?

11  A.  That was partially under the bed.  It was stuffed up under

12  the bed to the corner of the bed.  And actually, the bag was

13  folded down, but you could see some bills within that bag.

14  Q.  And was that -- that's something you saw?  You were the

15  initial person to see that?

16  A.  Yes, sir.  I was the first to see it when I cleared the

17  room.

18  Q.  Does that picture accurately depict the condition of the

19  money when you first observed it?

20  A.  Yes, it does.  Meaning accurately depict where the money was

21  located?

22  Q.  That's correct.

23  A.  Yes.  At the corner of the bed, yes, sir.

24  Q.  When you initially found the money, though, where was it

25  located?

```
 1   A.   At the corner of the bed, but the bag was stuffed to the
 2   side here where -- I don't know what -- this bucket or black
 3   thing, but it was stuffed to the side of the bed back there with
 4   these items.
 5   Q.   Was it readily observable?
 6   A.   Yes.  Oh, absolutely.
 7   Q.   Would you look at what's been marked as Government's Exhibit
 8   5, please.  Would you identify that?
 9   A.   Yes.   That would be the money that was contained within the
10   bag.
11   Q.   And that is a picture of the money actually that's been
12   extracted from the bag as depicted in the earlier exhibit?
13   A.   That's correct.
14   Q.   And does that picture accurately reflect the condition of
15   the money when you found it?
16   A.   Yes, sir.
17            MR. HARMON:  Your Honor, I'm going to offer into
18   evidence Government's 5 and 4, please, sir.
19            THE COURT:  Any objection?
20            MR. MADDOX:  No objection, Your Honor.
21            THE COURT:  Admitted over no objection.
22   Q.   Sir, what did you do with those items after you recovered
23   them -- excuse me -- after you found them?
24   A.   After they were -- after the items were found, I basically
25   noted where the items were at, and I informed a narcotics
```

1  officer of where the items were and what I had located there.

2  Being in SWAT, I don't usually deal with retrievals or anything

3  else like that, so I informed them so they could photograph the

4  evidence.

5  Q.  Do you know who was the officer who noted the items?  Do you

6  recall?

7  A.  Yes.  I believe that it was Detective Bentley.

8  Q.  Who was the evidence officer at that time?

9  A.  I want to say it was Detective Bentley.  I can't be 100

10  percent positive.

11  Q.  Will you answer Mr. Maddox's questions, please.

12  A.  Yes, sir, I will.

13                          CROSS EXAMINATION

14  BY MR. MADDOX:

15  Q.  Is it Lieutenant Wheeler?

16  A.  Yes, sir.

17  Q.  All right.  Lieutenant Wheeler, you went in and saw, as I

18  understand it, that bag sticking out from under the edge of the

19  bed; is that correct?

20  A.  That's correct, sir.  The paper bag.

21  Q.  Okay.  What did you do when you saw it?

22  A.  I held it right there, meaning I didn't touch the bag.  What

23  I did was noted where it was.  And when I located the bag, I

24  still partially flipped up the bed because what we do is we

25  completely dominate the residence to make sure that there's no

1   personnel withinside the residence, and you do something called

2   backtracking and clearance.  You normally check closets, up

3   under beds and everything else to see if anybody had hid up

4   under there.

5   Q.  Okay.  And was it readily apparent that it was money in the

6   bag when you looked at it?

7   A.  Yes, sir, at least from what I could see from the top of the

8   bag.

9   Q.  Uh-huh (positive response).

10  A.  That there was money.  I wouldn't know, you know, what was

11  under that.

12  Q.  Who actually took it out and -- out of the bag?

13  A.  I believe, to the best of my recollection, that would be

14  Detective Bentley.

15  Q.  Okay.  Could you tell how much money was there before it was

16  taken out of the bag?

17  A.  No, sir.

18  Q.  And what did you understand you were there for?

19  A.  I understood that what we were there for is the execution of

20  a document search warrant.

21  Q.  Okay.  So you wouldn't have gone into that house but for

22  being told that there was a search warrant to search the house

23  for documents; is that right?

24  A.  That would be correct.

25  Q.  In fact, you wouldn't have even entered on the property, the

1   yard, even, had you not been under the impression that there was

2   a search warrant; is that right?

3   A.  Well, I wanted -- my role -- I'm trying to explain this to

4   you.  My role at that day was to support narcotics.

5   Q.  Yes, sir.

6   A.  So if they had -- besides the document search warrant, if

7   they were conducting surveillance on that residence, if they had

8   probable cause to believe that narcotics activity was occurring

9   there or anything else, and they called us, I would have to rely

10  on what they just told me to go there and support a narcotics

11  officer at the scene.

12  Q.  Yes, sir.  And my question is simply this:  Had they not

13  told you they had to serve a search warrant there, you would

14  never have entered on the property, would you?

15  A.  I'm sorry.  One more time.  Can you rephrase that to me one

16  more time?

17  Q.  Okay.  Had narcotics officers, whoever they may have been,

18  not told you that they had a search warrant for that residence,

19  a document search warrant, you wouldn't have even entered on the

20  property, much less gone in the house, would you?

21  A.  No.  I wouldn't have had a reason to enter in the property.

22  Q.  That's all.  Thank you.

23          MR. HARMON:  Nothing further, Your Honor, for the

24  United States.

25          THE COURT:  Okay.  You may be excused.

```
 1              MR. HARMON:  Thank you, Your Honor.

 2              MR. MADDOX:  No objection.

 3         (Witness excused.)

 4              MR. MADDOX:  Your Honor, the United States calls

 5    Kristen Bentley.

 6         KRISTEN BENTLEY, the witness, having been duly sworn,

 7    testified as follows:

 8                              EXAMINATION

 9    BY MR. HARMON:

10    Q.  Ma'am, would you state your name, please, and spell your

11    first and last names.

12    A.  Corporal K. C., K-R-I-S-T-E-N, Bentley, B-E-N-T-L-E-Y.

13    Q.  And Corporal, where are you employed?

14    A.  Montgomery Police Department Narcotics Bureau.

15    Q.  How long have you been so employed?

16    A.  In narcotics since June of 2004.

17    Q.  How long have you been total with the police department?

18    A.  Approximately eight years.

19    Q.  I'm going to direct your attention to March the 31st of the

20    year 2006 and specifically to the execution of a warrant at a

21    West Shades Valley address in Montgomery, Alabama.  Do you

22    recall that event?

23    A.  Yes, sir.

24              MR. HARMON:  Your Honor, may I approach the witness?

25              THE COURT:  You may.
```

1  Q.  I'm going to show you what's been marked for identification

2  purposes as Government's Exhibit 3.  I think that's --

3  A.  Yes, sir.

4  Q.  Do you recall that item?

5  A.  Yes, sir.

6  Q.  Did you observe that item?

7  A.  Yes, sir.

8  Q.  Where was it located?

9  A.  In a bathroom in the residence.  If you're going to --

10  through the living room and turn left, which is actually headed

11  south, I believe, and you go towards the back bedroom, just

12  before you get to that back bedroom there is a bathroom directly

13  to your right.  In that bathroom, when you open the cabinet

14  under the sink, that's where that was located.

15  Q.  And what did that item appear to be to you?  I'm talking

16  about the ziplock bag there.

17          MR. MADDOX:  May I watch the proceedings?

18          THE COURT:  You may.

19  A.  It appeared to be a ziplock bag that contained powder

20  cocaine, and it was partially in a compressed form.

21  Q.  And did you -- what did you do with the item after you

22  discovered it?

23  A.  Photographed it.

24          MR. HARMON:  Your Honor, at this time I would offer

25  into evidence Government's Exhibit 3.

```
 1              THE COURT:  Any objection?

 2              MR. MADDOX:  No objection.

 3              THE COURT:  Admitted over no objection.

 4   Q.  Corporal Bentley, after you photographed the item, what was

 5   done with the item after that?

 6   A.  I recovered it and took it to the evidence officer, who

 7   would have been Corporal Wright.

 8   Q.  Will you answer Mr. Maddox's questions, please, sir.

 9   A.  Yes, sir.

10                        EXAMINATION

11   BY MR. MADDOX:

12   Q.  At what time did you find that item you just testified

13   about?

14   A.  I believe, if I'm not mistaken, that it was 11:42.

15   Q.  That was after a second search warrant was purportedly

16   obtained?

17   A.  Yes, sir.

18   Q.  Okay.  Were you there when the first search warrant was

19   purported to be served?

20   A.  Yes, sir.

21   Q.  Who actually served the search warrant?

22   A.  I know myself and Sergeant Wheeler and Sergeant Wright were

23   there.  As we approached the house, Lieutenant Crockett and

24   Corporal Wright were -- their attention was distracted by

25   chasing the individual that ran.  I believe Sergeant Wright
```

1   detained the other individual that was there, Otis Jones, and
2   she and sergeant -- well, Sergeant Wheeler at the time.  He's
3   now Lieutenant Wheeler.  The three of us, and I cannot remember
4   if there was another person there with us or not, that actually
5   went to the door and stayed with the mother and went into the
6   residence.
7   Q.  Went into the residence?
8   A.  Right.
9   Q.  All right.  But who had the search warrant?
10  A.  Corporal Bartlett.
11  Q.  Was he there?
12  A.  At the time that we went into the residence, no, sir.
13  Q.  Okay.  Do you know what the search warrant authorized you to
14  search for?
15  A.  A document search warrant, which is a standard document
16  search warrant that we use.  All of them are basically derived
17  from a template, and you would know what all of them are going
18  to say.  They're not going to be one different from the other.
19  Q.  Okay.  And the judges always issue the same one for you?
20  A.  Yes, sir.
21  Q.  Okay.  Now, the search warrant that we're talking about, the
22  first one, did you ever see it?
23  A.  I don't recall if I saw it or not.  I could have seen it
24  when Corporal Bartlett arrived, or I might not have seen it.  I
25  don't know.

```
1   Q.  And do you know what the proper actions --
2       You were acting under Alabama law with an Alabama search
3   warrant, weren't you?
4   A.  Of course.
5   Q.  Do you know what the proper procedure for serving a search
6   warrant is?
7   A.  As far as a document search warrant or drug search warrant,
8   or are you referring to any search warrant?
9   Q.  Let's say a document search warrant, since that's what we're
10  talking about.  What's the procedure for serving one?
11  A.  On a document search warrant, you knock on the door and wait
12  for an individual to come to the door.  Give them appropriate
13  time to come to the door.  You also must serve a document search
14  warrant during daylight hours.
15  Q.  Right.  But don't you have to give a copy of the search
16  warrant to them when you get there?
17  A.  Not necessarily when you get there.  They're going to have
18  to have a copy of that search warrant.
19  Q.  Did anybody ever give them a search warrant?
20  A.  I'm certain that it was given to them, but I didn't give it
21  to them myself if that's what you're asking.
22  Q.  So nobody knows that it was actually ever served, do they,
23  the copy?
24  A.  When you serve that search warrant, you have to have served
25  it, left them a copy, and then turn in the copy to the court.
```

```
 1  Q.  But you don't know who did that that day, do you?
 2  A.  It should be Corporal Bartlett, which was the case agent.
 3  But Shon Wright, Corporal Wright would have been the one who
 4  actually executed it as the evidence officer.  That's just our
 5  general procedure is the evidence officer is given -- once the
 6  case agent has obtained a search warrant, then the case agent
 7  will give that search warrant to the evidence officer, and
 8  typically the evidence officer is going to be the one to execute
 9  it unless there was some special circumstances, and in this case
10  I don't believe there were.
11  Q.  Let's ask it again.  I'll ask this again.
12  A.  Yes, sir.
13  Q.  You don't know who, if anyone, executed or served that
14  search warrant, do you?  You.  You don't know, do you?
15  A.  I can't be for certain, no, sir.
16  Q.  Okay.  Now, did you ever see the search warrant?
17  A.  I do remember seeing the search warrant as we were standing
18  at the kitchen table.
19  Q.  What did it authorize?  What did it say?
20  A.  I didn't read all of the content of the search warrant.
21  Q.  Did you check to see if the address was accurate or anything
22  like that?
23  A.  I don't remember verifying that I looked at the numbers on
24  the outside of the house, if that's what you're asking.
25  Q.  Did you ever see the money that was found under the bed?
```

1  A.  Yes, sir.

2  Q.  Did you actually open up the packages of money and pull it

3  out from under the bed, or who did that?

4  A.  It was -- like I said, he was Sergeant Wheeler at the time,

5  but he and I were in the bedroom at the same time.  He indicated

6  to me as we were clearing the house to make sure there were no

7  other individuals in there -- Sergeant Wheeler, Lieutenant

8  Wheeler indicated that he had found some money in a bag, and he

9  pointed to it.

10     After we had discovered that nobody else was inside the

11  residence other than Mr. Jones' mother, we eventually went back

12  to the money, and he and I both unwrapped the money and counted

13  the money and turned it -- he was the one who actually found it

14  and turned it in to the evidence officer, but I helped him count

15  it.

16  Q.  And that was before the second search warrant was obtained,

17  wasn't it?

18  A.  That's correct.

19  Q.  Okay.  And, in fact, the finding of that money was part of

20  what caused y'all to decide to get another search warrant?

21  A.  No, sir.

22  Q.  What --

23  A.  The document search warrant would have covered seizing

24  the -- or would have covered us looking for currency.

25  Q.  Okay.  Where does a document search warrant allow you to

```
 1   look in a house?
 2   A.   Any place that documents could be kept.
 3   Q.   Okay.  So if I wrote down drug information on a little three
 4   by five card and folded it all up and put it into one of these
 5   open-up match boxes and closed it back up, and it's in a
 6   matchbox like that, that document search will let you look in
 7   there, won't it?
 8   A.   That's correct.
 9   Q.   And if my mother lives in my house and she's got a diary in
10   her bedroom with Diary of Mama Maddox on it, it allows you to
11   open that up and read it to make sure there's no drug
12   information, doesn't it?
13   A.   That would be correct.
14   Q.   All right.
15            MR. MADDOX:  No more questions.  Thank you.
16            THE COURT:  Anything further?
17            MR. HARMON:  Nothing further from the United States,
18   Your Honor.
19            THE COURT:  May she be excused?
20            MR. MADDOX:  No objection.
21            THE COURT:  You're excused.  Thank you.
22            (Witness excused.)
23            THE COURT:  Who's your next witness?
24            MR. HARMON:  Your Honor, Scott Edwards.
25            Your Honor, if I neglected, I want to offer into
```

83

```
 1   evidence Government Exhibit 37.
 2           THE COURT:  It's offered and admitted.
 3        SCOTT EDWARDS, the witness, having been duly sworn,
 4   testified as follows:
 5                       DIRECT EXAMINATION
 6   BY MR. HARMON:
 7   Q.  Will you state your name, please, sir.
 8   A.  Scott Edwards.
 9   Q.  And spell your first and last names.
10   A.  S-C-O-T-T, E-D-W-A-R-D-S.
11   Q.  And how are you employed, sir?
12   A.  With the City of Montgomery, Montgomery Police Department,
13   currently assigned to the narcotics bureau.
14   Q.  Okay.  How long have you been so employed?
15   A.  Been employed with the police department for 13 years and
16   assigned to the narcotics bureau for seven.
17   Q.  Sir, I want to direct your attention back to March 31st of
18   2006.  Did you have any type of special appointment, any special
19   type of service you were providing for the Montgomery Police
20   Department at that time?
21   A.  Yes, sir.
22   Q.  What was that?
23   A.  I was contacted by one of my supervisors who advised me that
24   they had just executed a search warrant on West Shades Valley.
25   I went there, and they told me they had a large amount of
```

1  currency that they wished to seize along with an amount of

2  cocaine that was also seized.

3  Q.  Did you actually participate in any of the events leading up

4  to the discovery of the money and the narcotics?

5  A.  No, sir.

6  Q.  Did you question an individual as a result of the findings

7  that were relayed to you by the other officers?

8  A.  Yes, sir, I did.  I spoke to Mr. Otis Jones.

9      I advised him of his rights.  I asked him if he knew where

10 the money came from or whose money it was.  He stated that a

11 subject he only knew by the name of Boo gave it to him.  I asked

12 Mr. Otis Jones where Boo got the money from, and he stated, oh,

13 man, you know.  It's dope money.

14      MR. MADDOX:  Your Honor, I'm not sure why we're talking

15 about Otis Jones.  I think I object to this.  In fact, I do.

16      THE COURT:  It's a little late.  Overruled.

17 Q.  If you will, sir, did you -- the individual you spoke with,

18 can you identify him in the courtroom?  The individual who gave

19 you that information?

20 A.  I do not see Mr. Otis Jones, to my recollection, no.

21 Q.  All right.  Was Mr. Jones -- he was Mirandized, I think you

22 said?

23 A.  Yes, sir, I advised Mr. Otis Jones of his Miranda rights.  I

24 asked -- I also advised Mr. George Jones if he -- Mr. George

25 Jones stated he did not wish to give a statement.

```
 1              MR. HARMON:  That's all the questions I have, Your
 2   Honor.
 3                      CROSS EXAMINATION
 4   BY MR. MADDOX:
 5   Q.  Did you go to the residence of George Jones at any time that
 6   day?
 7   A.  Yes, sir, I did.
 8   Q.  At what point did you get there?  What time of day, your
 9   best recollection?
10   A.  I do not remember.  It was close to them finishing the
11   search warrant.
12   Q.  Which search warrant?
13   A.  Both search warrants.
14   Q.  Oh, okay.  So it would have been around the noon hour?
15   A.  I do not recall the exact time.
16   Q.  Okay.  Did you ever see the search warrants at the
17   residence?
18   A.  I do not recall if I actually looked at the search
19   warrants.
20   Q.  Who had the -- who got the search warrants?
21   A.  Who applied for the search warrants?
22   Q.  Yes, sir.
23   A.  Detective Bartlett.
24   Q.  Okay.  Do you have any personal knowledge -- Let me withdraw
25   that.
```

1    Were you with him or did you hear him during the course of
2  his attempting to obtain the search warrants?
3  A.  No, sir, I was not.
4  Q.  Is it your understanding that Corporal Stillman obtained the
5  second one?
6  A.  Yes.
7  Q.  And was that based on information, as far as you know, that
8  Bartlett gave to him?
9  A.  Yes, sir, to the best of my knowledge.
10  Q.  Okay.  You have no personal knowledge of whether the search
11  warrants were actually served, physically served that day or
12  not, do you?
13  A.  Are you asking me did I see them serve them to the
14  homeowner?
15  Q.  Yes, sir.
16  A.  No, sir, I did not.
17        MR. MADDOX:  No more questions.
18        MR. HARMON:  Nothing further from the United States,
19  Your Honor.
20        THE COURT:  Okay.  You may be -- go back to your seat.
21        MR. HARMON:  Your Honor, the United States has no
22  further witnesses.
23        THE COURT:  Okay.  United States has rested.  What's
24  the intention of the claimant?
25        MR. MADDOX:  The claimant does not intend to call

```
 1   witnesses, Your Honor.

 2          THE COURT:  All right.  This case is set for trial

 3   when?

 4          MR. HARMON:  Third week in October.

 5          COURT CLERK:  10/15.

 6          THE COURT:  I thought I'd entered an ordered to put it

 7   back one week.  Maybe it's another case I'm thinking about.  Set

 8   for October 15th?

 9          MR. HARMON:  Yes, sir, that's what I'm showing.

10          THE COURT:  All right.  As for the motion to suppress,

11   I'll give each side seven days to get me a brief analyzing the

12   evidence that we have with respect to the motion to suppress.

13          With respect to completing the pretrial, I've already

14   told the claimant I'll give you till Monday to get your

15   contentions in.  There's probably some more facts you can

16   stipulate to, but it being a nonjury case, just do the best you

17   can.  And resubmit, if you would, Mr. Harmon --

18          I guess you're the one that submitted the proposed

19   pretrial order?

20          MR. HARMON:  Yes, sir.

21          THE COURT:  All right.  Give me as many stipulations as

22   you can and the contentions.

23          Are there any discovery issues or other issues

24   outstanding?  I'm not aware of any.

25          MR. MADDOX:  Judge, I'm not aware of any either.
```

```
 1           MR. HARMON:  I'm not aware of any, Your Honor.  We have

 2    taken Mr. Jones' deposition, and there's been no discovery

 3    issues.

 4           MR. MADDOX:  Might I request until Monday week to file

 5    my brief?  I have an evil deadline next week.

 6           THE COURT:  Monday week would be fine, and that would

 7    be the 17th perhaps?

 8           MR. MADDOX:  Yes, sir.  Thank you, Your Honor.

 9           MR. HARMON:  That would be for both parties, Your

10    Honor?

11           THE COURT:  Both parties, yes.  And I won't take any

12    reply briefs.  I just want -- and I'm not requiring you to file

13    a brief, but if you want to file a brief, you've got until then

14    to do it.

15           Now then.  As for the actual trial, the way these

16    things go, how much more evidence are we going to have at

17    trial?

18           MR. HARMON:  Your Honor, I would tell the Court, in all

19    candor, I believe we just about covered the gamut.  There may be

20    a few other things, but for the most part, the Court has heard

21    the vast majority of the government's evidence --

22           THE COURT:  The government's case?

23           MR. HARMON:  The government's case.  That's correct,

24    your Honor.  I speak only for the government.

25           MR. MADDOX:  Suffering from the disability of having a
```

1  pending state criminal case against the claimant, Your Honor,

2  we're rather limited in what we can offer by way of testimony in

3  this case.  I would anticipate, and I might have as many as two

4  witnesses, but I do not believe they would be very lengthy

5  witnesses.

6          THE COURT:  So we can dispose of this case in half a

7  day probably?

8          MR. MADDOX:  If you don't let me do closing argument,

9  yes, sir, I think so.

10          MR. HARMON:  I do believe so, Your Honor.  I would add

11  there is one -- I want to make sure Mr. Maddox is aware of this;

12  that during the course of his deposition, Mr. Jones did take the

13  Fifth.  I understand Mr. Maddox is in a quandary here and

14  probably that he will not testify.  But if that should change in

15  the interim, United States will object to Mr. Jones testifying

16  because of this assertion of the Fifth.  I just want to make

17  sure that's clear.  That is an issue that -- we can brief that

18  or have that before the Court until -- before it gets to trial

19  time.

20          THE COURT:  Then I would suggest that you file a motion

21  in limine, if you would, and we can get the claimant's

22  response.  I'll issue a standard pretrial order after I get your

23  contentions.  And if you're going to get contentions by Monday,

24  then you can, say, by next Tuesday or Wednesday have a revised

25  proposed pretrial order.  I'll get one out within a week.

1    And I suppose at this point settlement is not an

2 issue?

3    MR. HARMON:  I would say, Your Honor, the chances of

4 settlement are very slim.

5    THE COURT:  All right.  Anything further?

6    MR. MADDOX:  No, sir.

7    THE COURT:  Okay.  I'll take your arguments in writing

8 and your analysis of what we heard today, and I'll get you an

9 opinion.  We're adjourned.  Thank you.

10  (Proceedings concluded at 3:50 p.m.)

11     * * * * * * * * * * * * * *

12     COURT REPORTER'S CERTIFICATE

13    I certify that the foregoing is a correct transcript

14 from the record of the proceedings in the above-entitled matter.

15    This 11th day of October 2007.

16

17        /s/ Patricia G. Starkie
          Registered Diplomate Reporter
18        Certified Realtime Reporter
          Official Court Reporter
19

20

21

22

23

24

25